**NORTHEASTERN CONSOLIDATED COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 65 C 2029.

United States District Court
N. D. Illinois, E. D.

Nov. 30, 1967.

Frank H. Uriell and Paul A. Teschner, Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., for plaintiff.

Mitchell Rogovin, Asst. Atty. Gen., Donald R. Anderson and Harold J. Heltzer, Attys., Dept. of Justice, Washington, D. C., and Edward V. Hanrahan, U. S. Atty., Chicago, Ill., for the United States.

## MEMORANDUM OPINION

DECKER, District Judge.

This is an action arising under 28 U.S.C. § 1346(a) (1) for recovery of federal income taxes alleged to have been illegally assessed and collected. Plaintiff is a Delaware corporation engaged primarily in the construction of gas distribution facilities. At issue is the disallowance by the District Director of Internal Revenue of a "bad debt" deduction claimed by plaintiff in its federal income tax return for the 1956 fiscal year, that is, the year ending March 31, 1956. Plaintiff's claimed "bad debt" was the result of the inability of a company set up by plaintiff's sole stockholder and one of its officers to repay the major portion of monetary advances from plaintiff. Plaintiff claims that the advances were and should be regarded as loans, and the Government considers them to have been contributions to capital. Plaintiff thus asserts that the unpaid balance of the advances was deductible in full as a bad debt, while the Government argues that it was deductible only as a long-term capital loss to be offset against capital gains, of which plaintiff had none in this case.

The facts have been stipulated by the parties. Basically they are as follows: Plaintiff was incorporated in Delaware in 1949 under the name Consolidated Gas and Service Company. Its capital stock was owned entirely by John C. Donnelly, and its business was construction of gas distribution facilities. In 1954 a separate company, Northeastern Electric Construction Corporation (henceforth "Northeastern") was created, with Donnelly and Arthur Schmidt, an officer of plaintiff, as stockholders. Northeastern was set up to undertake electrical construction work for one of plaintiff's most important customers. The separate corporate entity was considered necessary because of certain rules of the electrical workers union which prevented the workers from being employed by companies not doing electrical work exclusively.

The initial capital of Northeastern was about $12,000. From the end of 1954 to March, 1956 plaintiff made advances of over $300,000 to or on behalf of Northeastern primarily for operating expenses. These advances were carried as accounts receivable by plaintiff, and no written evidences of indebtedness were given, no interest or maturity date was agreed upon, and no security was provided. Despite the advances, Northeastern incurred serious losses from its inception. In March, 1956 it was decided to merge the two companies into one, the present plaintiff known as Northeastern Consolidated Company.

The merger was undertaken as a statutory merger under Delaware law and included a transfer of Northeastern's assets to plaintiff. Plaintiff's advances to Northeastern were left unreimbursed after the transfer in the amount of $199,791.09. This amount, the remainder of

what plaintiff characterizes as the total "debt," was cancelled on plaintiff's books; plaintiff then claimed it as a worthless debt and deducted it from taxable income for the year ending March 31, 1956. The Internal Revenue Service first allowed the deduction, including the carryback of plaintiff's resultant 1956 net operating loss to 1955 and 1954, but then the Service subsequently disallowed it and assessed a deficiency. Plaintiff paid the deficiency and unsuccessfully filed claims for refund. Those claims were denied, and plaintiff now seeks a refund through this suit.

As part of the merger effected in 1956, Northeastern's own net operating loss, which totaled about $187,000 at the time of the merger, was made available to plaintiff to be offset against its taxable income under the provisions of 26 U.S.C. § 381(a) and (c). Plaintiff claimed and was allowed deductions by virtue of this for 1959, 1960, and 1961, in an aggregate amount of about $85,000.

Although plaintiff's complaint in this case seeks recovery of substantial amounts for 1954, 1955, and 1956, plaintiff now concedes that the stipulations and briefs show that plaintiff's possible recovery is limited to the following:

| | |
|---|---|
| 1954 | $ 10.75 |
| 1955 | 56,784.95 |
| 1956 | 0 |

Plaintiff also seeks the amounts of interest made applicable by statute if it should recover. The above amount of $10.75 for 1954 is what remains after the effects of the statute of limitations for that year are recognized. The original amount for 1955 was reduced, and the amount for 1956 eliminated, by refund payments already made to plaintiff for those years on grounds distinct from those asserted by plaintiff at present. Although nothing is now sought to be recovered for 1956, the central issue in the case is, nevertheless, the bad debt deduction claimed for that year, with its carryback effects to 1955 and 1954.

The Government's assertion that the advances in question were contributions to capital, rather than loans, must be considered first, for if it is meritorious, there is no need to consider the other arguments raised by the parties. It is clear in this Circuit that the burden is upon the taxpayer in a case such as this to prove that the advances were loans rather than capital contributions. In Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902 (7th Cir. 1959), the court said,

> "In determining whether the cash payments * * * represented loans or additional capital investment, no single test can provide the answer. The burden of establishing that the advances were loans is upon the taxpayers." [Citations omitted.] Id. at 905.

There are many cases such as this which indicate that the taxpayer has the burden of proving that he is entitled to a bad debt deduction. United States v. Henderson, 375 F.2d 36 (5 Cir. 1967); Moughon v. Commissioner of Internal Revenue, 329 F.2d 399 (6th Cir. 1964); Baumann & Co. v. Commissioner of Internal Revenue, 312 F.2d 557 (2d Cir. 1963); Bair v. Commissioner of Internal Revenue, 199 F.2d 589 (2d Cir. 1952).

The cases also make it clear that where closely held corporations are involved, each element of the dealings between them will be closely scrutinized to determine whether advances made by one to the other are to be treated as loans. As was summarized in *Arlington Park Jockey Club,*

> "the courts have laid down rather stringent tests to determine whether advances to closely held corporations may be treated as loans for tax purposes. This court said in Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F. 2d 182, 186 [1942]:
>
> ' * * * the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event.'

"In such cases, courts have stressed various factors such as the debt-equity ratio; the use to which the funds were put; whether outside investors would make such advances and lack of reasonable expectation of repayment." Id. at 905.

Very similar statements appear in United States v. Henderson, supra, and Moughon v. Commissioner of Internal Revenue, supra.

While realizing that the factual elements establishing a bona fide debt may vary in different cases, the courts and the tax authorities nevertheless have attempted to formulate and adhere to a general definition. In order for plaintiff to carry his burden in the present case, it must show that the advances it made to Northeastern fall within the definition. As indicated in the quotation above, the Court of Appeals for the Seventh Circuit early stated that a loan essentially involves "a definite obligation, payable in any event." In a more recent decision, that court referred to "the classic criteria of a bona fide debt set out in Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399 (2d Cir. 1957)." Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, 350 F.2d 225, 228 (7th Cir. 1965). In *Gilbert*, it was said,

"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, too great a variation will of course preclude such treatment." [Citations omitted.] 248 F.2d 402–403.

The essence of a debt for tax purposes has been more succinctly characterized in this way:

"The important underlying principle is that no valid debt exists unless there is an unconditional obligation of another to pay the taxpayer." 5 Mertens, Law of Federal Income Taxation § 30.-03. See Treas.Reg. § 1.166–1(c) (1967).

These statements indicate that the various aspects of the advances made by plaintiff must be examined here in detail in order to see whether they constituted an unconditional obligation upon Northeastern to repay the amounts obtained from plaintiff.

■ On the facts before me I cannot find that plaintiff has proved the existence of such an obligation. In a number of respects it appears clear to me that the intention of plaintiff, and the practical, business significance of the advances, demonstrate that the advances were contributions to the capital of Northeastern. First of all, the heavy preponderance of "debt" to equity in the financial structure of Northeastern during its brief existence suggests that the advances were not regarded by plaintiff as loans and should not be considered as such now. This preponderance is not determinative, but it does seem that with operating capital of only $12,000, the advances of over $300,000 which were used for operating expenses were necessary capital of the sort ordinarily provided by the creation of equity interests. Further suggesting this is, of course, the absence of any provisions for interest, fixed maturity, or security in relation to the advances. The only relevant formalities gone into were entry of the advances as accounts payable on Northeastern's books and as accounts receivable on plaintiff's.

Additionally it seems evident that the repayment of the advances rested solely upon the success of Northeastern's venture. There apparently were no other resources of significant size held by Northeastern out of which plaintiff could have secured repayment had the venture failed, and this apparently was evident to all parties at the outset. That this consideration, and the preponderance of debt over equity, can be taken as indicative of an intention that the advances were to be capital investments rather than loans is suggested by the discussion

in American Processing and Sales Company v. United States, 371 F.2d 842 (Ct. Cl.1967). That case is relied upon strongly by plaintiff here, but it is not persuasive authority in its favor. The Court of Claims in that case plainly takes the approach, which I have already discussed, of considering each case on its own facts:

> "[I]n the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion." Id. at 848.

The court also adopts the type of general definition of debt which I have examined. The opinion discusses a number of cases related to the questions in the present case and concludes that the advances there involved were loans and not contributions to capital, "as a matter of 'substantial economic reality.'" That reality is lacking here.

It seems to me that in *American Processing* and in the other case plaintiff chiefly relies upon, Byerlite Corporation v. Williams, 286 F.2d 285 (6th Cir. 1960), the courts are taking a pragmatic view of the business transactions involved and are concluding that bona fide lending does take place when there are open account advances and "credits against the advances [are] made in the form of delivered materials." 371 F.2d at 855. In other words, each of those cases relates to an instance in which "the open account * * * was the product of credits and debits resulting from mutually advantageous trading." Id. at 854. The present case does not involve this common form of mutually offsetting business dealings based on continuing credit and intermittent, but assured repayment. The court in *American Processing* explicitly recognized that the result on the facts before it probably had to be different from the result in a case like the present one. The court said that a debit balance resulting from mutually advantageous trading activities,

"assumes a different complexion than had it been solely cash advances, for the latter would be more amenable to construction as capital contributions." Id.

The present case, of course, involves "solely cash advances," with no repayment, credits, or reciprocal trade dealings at all.

In further support of the Government's contention that the advances were risk capital are the plaintiff's repeated assertions in its briefs that the activities of Northeastern were really parts of plaintiff's own business, and that they were not a separate corporate venture. Plaintiff apparently has made and reiterated this point in order to indicate that there was no intention present to invest in a *separate* venture, that is, in the risks of a new corporate enterprise. A more significant effect of plaintiff's argument, however, is that the advances to Northeastern in fact were considered additional investments in plaintiff's *own* business, or at least in a new branch of it, with all the same risks attendant upon the stockholder's and officers' investment of capital and effort in plaintiff itself. As one of plaintiff's officers indicated in his deposition, the understanding was that the advances would be repaid out of profits made by Northeastern at a future time. This is more plausibly the attitude of an investor than of a lender.

As one further consideration, it may be asked whether Northeastern could have obtained cash in the amount of $300,000 in total from any other sources on the same sort of terms, or absence of terms, as it received from plaintiff. I think it is highly unlikely that that could have been done, especially after it apparently was clear within a few months that Northeastern was not making money.

On the basis of these various factual considerations, it is my conclusion that no bona fide debt was created by plaintiff when it made the advances to Northeastern, but rather plaintiff was contributing to the capital of Northeastern. Consequently, plaintiff was not entitled to a bad debt deduction for 1956.

■ Plaintiff urges, however, that even if the deduction was not allowable as a bad debt under § 166, it nevertheless was allowable as a business expense under § 162. This argument is without merit inasmuch as plaintiff was definitely not in the business of making advances to other companies. Plaintiff, as a separate corporate taxpayer, was not even in the business of constructing electrical facilities, as is indicated by the fact that the actual operating expenses incurred through use of the advances were deducted by Northeastern as its own expenses and not by plaintiff. Plaintiff has not met the burden it assumed of proving that the advances were ordinary and necessary business expenses. See Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943).

■ Plaintiff's final argument is that it is entitled to the deduction as a business loss by virtue of § 165 of the Internal Revenue Code. This argument also is not persuasive. In the first place, it is not clear that plaintiff's failure to obtain reimbursement of the advances constitutes a "loss" within the meaning of § 165. Rather it appears that plaintiff has experienced a "failure of profit or the loss of potential income" on its investment in Northeastern. 5 Mertens, Law of Federal Income Taxation § 28.12, p. 33. If this is so, plaintiff is not entitled to any sort of benefit at all from § 165. Secondly, whatever actual loss has been suffered by plaintiff can be considered a capital loss. It is true that no "sale or exchange" appears to have taken place with regard to plaintiff's unreimbursed interest in Northeastern; nevertheless, under the terms of § 165(g) plaintiff's "loss" can receive only the treatment accorded a capital loss. This result is compelled by the case of Kalech v. Commissioner of Internal Revenue, 23 T.C. 672 (1955), in which a taxpayer's advances to a corporation were held to be capital contributions rather than loans. See 5 Mertens, id. at § 28.38, p. 159. Section 165 (g) now provides that any loss that results when a security which is a capital asset becomes worthless shall be treated as a loss from a "sale or exchange" of a capital asset. In *Kalech* the court considered the predecessor to § 165(g) and said, "Securities, as defined by that section, include not only actual shares of a corporation but the 'rights to subscribe for or to receive such shares,' which is what petitioner here had by virtue of his advances to the corporation." Id. at 681. The present definition of "securities" includes a similar reference to "a right to subscribe for, or to receive, a share of stock in a corporation. This would seem applicable, by the reasoning in *Kalech,* to the plaintiff's interest in Northeastern as a result of its capital investment by means of the advances. Thus the only possible loss deduction available for plaintiff would be a long term capital loss, which would not entitle it to a refund in the present case.

As an additional, alternative ground for the decision of this case, it must be said that plaintiff is attempting here to obtain to some extent double deductions for a single economic loss. As I have already noted, plaintiff was allowed to benefit from Northeastern's net operating loss; plaintiff took deductions aggregating approximately $85,000 in its tax returns for 1959, 1960 and 1961 in this respect. The case of Marwais Steel Company v. Commissioner of Internal Revenue, 354 F.2d 997 (9th Cir. 1965), cited by the Government, clearly indicates that double deductions in a case such as this will not be permitted.

The Government does acknowledge that plaintiff only got $85,000 worth of deductions by reason of Northeastern's net operating loss of over $187,000. Plaintiff contends that this discrepancy nullifies the double deductions argument. In answer the Government presents what appears to be a theory that the plaintiff has made some sort of implied waiver of the various deduction arguments it now makes. The Government says, "The point is that the net operating loss carryover was the one claimed by the plaintiff." I am not convinced that this waiver conception is correct, but it is in any

event not necessary for me to decide the point now. The plaintiff has failed to show that it is entitled to the 1956 deduction and the carrybacks on any ground; consequently it is entitled to no refund at all. If plaintiff had shown some basis for refund, perhaps the double deductions argument would require a scaling down of the recovery, even if not a total preclusion of recovery. On the facts before me, however, I find that no refunds at all are justified.

For the foregoing reasons, I have on this day entered judgment in favor of the defendant and against the plaintiff, with costs to be assessed against the plaintiff.