**NORTHEASTERN CONSOLIDATED COMPANY, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 16860.**

United States Court of Appeals Seventh Circuit.

Jan. 6, 1969.

Rehearing En Banc Denied Feb. 17, 1969.

Frank H. Uriell, Paul A. Teschner, Chicago, Ill., Pope, Ballard, Uriell, Kennedy, Shepard & Fowle, Chicago, Ill., of counsel, for appellant.

Mitchell Rogovin, Asst. Atty. Gen., Tax Division, Lee A. Jackson, Jonathan S. Cohen, Robert I. Waxman, Attorneys, U. S. Department of Justice, Washington, D. C., Thomas A. Foran, U. S. Atty., Chicago, Ill., for appellee.

Before CASTLE, Chief Judge, and SWYGERT and KERNER, Circuit Judges.

CASTLE, Chief Judge.

This is an appeal from the district court's judgment for the defendant, the United States, rendered in the plaintiff-taxpayer's suit for refund of income taxes, plus interest, for the fiscal years ended March 31, 1954 and March 31, 1955 in the respective amounts of $10.75 and $56,784.95. The controversy stems from the Commissioner's disallowance of taxpayer's deductions for the alleged bad debts of an allegedly related corporation upon the merger of the taxpayer with that corporation.

A brief look at the transactions leading up to this suit, as adduced in the district court, is necessary. The taxpayer was originally organized in 1949 as a Delaware corporation, under the name of Consolidated Gas and Service Company (Delaware Consolidated). The entire capital stock of this corporation, which engaged in the construction of gas distribution facilities, was owned by John C. Donnelly.

In 1954, Niagra Mohawk Power Company, one of Delaware Consolidated's most important customers, became involved in the St. Lawrence Seaway Project and began to allocate considerably more funds for the electrical facilities needed for that Project than for the construction of gas facilities. In order to accommodate this customer, as well as to enter the electrical construction field, a separate company, Northeastern Construction Corp. (Necco) was organized with Donnelly and Arthur Schmidt, an officer of Delaware Consolidated, as its only shareholders. The separate company was formed because the rules of the International Brotherhood of Electrical Workers prevented its members from being employed by companies not doing electrical work exclusively.

Thus, Necco was formed, with initial capital of only $12,358.11, in order to engage exclusively in the construction of electrical facilities. Because of this thin capital base, Delaware Consolidated advanced over $300,000 to or on behalf of Necco, primarily for operating expenses. These advances were carried as current liabilities by Necco and as current accounts receivable by Delaware Consolidated. No written evidences of indebtedness were given, no interest or maturity date was agreed upon and no security was provided.

The Necco venture proved unprofitable from the beginning, however, and in March, 1956, it was decided to merge Necco with Delaware Consolidated to form the present taxpayer corporation, Northeastern Consolidated Company. After the statutory merger, under Delaware law, was completed, including a transfer of Necco's assets to taxpayer, there remained as unpaid balances the amount of $199,791.09, representing the advances to Necco which were unreimbursed.

Taxpayer then cancelled this amount on its books as a bad debt and deducted

it from ordinary income for the fiscal year which ended March 31, 1956. The Commissioner first allowed the deduction and carryback, but subsequently disallowed it and assessed deficiencies. As part of the merger effected in 1956, Necco's own operating loss of about $187,000 was made available to taxpayer to be offset against its available income under 26 U.S.C. § 381(a) and (c). Taxpayer claimed and was allowed deductions by virtue of this for 1959, 1960, and 1961, in an aggregate amount of approximately $85,000.

The primary issue is whether the Commissioner's disallowance of the bad debt deduction against ordinary income was proper. This disallowance, as well as the Government's case before the district court and on appeal, is based on the assertion that the advances to Necco were contributions to capital, rather than loans, and thus the losses incurred were capital losses which could be deducted only from capital gains, of which there were none in the relevant years.

The district court, in a thorough and well-reasoned opinion, 279 F.Supp. 592 (N.D.Ill.1967), found that the advances constituted contributions to the capital of Necco rather than loans, and therefore could not be allowed as a bad-debt under 26 U.S.C. § 166. This finding was based on the following factors:

(1) The heavy preponderance of "debt" to equity ($300,000 to $12,000);

(2) The fact that the repayment of the advances rested solely on the success of Necco's venture;

(3) Plaintiff's own assertions that the activities of Necco were really part of plaintiff's own business and that they were not a separate corporate venture;

(4) The unlikeliness that Necco could have obtained $300,000 from any other source on the same terms, or absence of terms, as it received from plaintiff. 279 F.Supp. at 595–596.

■ We agree with the district court and adopt its opinion on this issue. We find that this conclusion is compelled by looking at the substance, rather than the form, of the transactions.

■ Similarly, we adopt the opinion of the district court in its holding that the deduction was not allowable as an ordinary and necessary business expense under Section 162, and that it was not allowable as a business loss under Section 165. 279 F.Supp. at 597. On this last point, however, we feel that some further elaboration is necessary.

■ Taxpayer contends that, even if the advances to Necco constitute an investment, Section 165[1] allows a deduction against ordinary income for the uncompensated loss suffered on the investment. The real problem taxpayer faces in this area is in showing that its investment in Necco was not a capital asset and therefore that the loss can be de-

1. § 165 Losses.
  (a) General rule.
    There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
      *    *    *    *    *
  (f) Capital losses.
    Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.
  (g) Worthless securities.
    (1) General rule.
      If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.
      *    *    *    *    *
    (3) Securities in affiliated corporation.
      For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if—
      (A) at least 95 percent of each class of its stock is owned directly by the taxpayer * * *

ducted from ordinary income. Taxpayer's first argument on this point is that, although securities in other corporations ordinarily constitute capital assets, the instant security was purchased in the ordinary course of business and was therefore entitled to non-capital treatment. We agree with and adopt the district court's holding rejecting this contention on the grounds that the creation of Necco as a separate entity, engaged in unrelated work, was not done in the ordinary course of taxpayer's business.

Taxpayer further attempts to bring its investment under non-capital treatment by arguing that the transaction falls under Section 165(g) (3), which provides that any security of a corporation affiliated with the taxpayer shall not be treated as a capital asset. This argument fails, however, for two reasons.

▉▉▉ First of all, in order to fall under Section 165(g) so as to be treated as non-capital assets, the securities held by the taxpayer must become "worthless." We find that the security held by the taxpayer in the instant case did not become "worthless," but was only impaired to the extent of the loss suffered when the merger took place. See 5 Mertens 28.65b and 28.66. Thus, looking at the substance of the transaction, taxpayer invested over $300,000 in Necco and, on Necco's merger with taxpayer, received back $192,852. Therefore, although taxpayer took a loss on its investment in the equity of Necco, its security did not become "worthless", as required by the statute.

▉▉▉ Secondly, even under plaintiff's reasoning, Necco does not qualify as an affiliated corporation. Under § 165(g) (3) (A), "a corporation shall be treated as affiliated with the taxpayer only if— (A) at least 95 percent of each class of its stock is owned directly by the taxpayer * * *" In the instant case, although taxpayer owned an equity investment in Necco, that investment was not in Necco's common stock. It is undisputed that Donnelly and Schmidt owned 100 percent of that class and thus Necco was not, under the statutory definition, affiliated with taxpayer since taxpayer did not own at least 95 percent of each class.

For the foregoing reasons the judgment below is affirmed.

Affirmed.

SWYGERT, Circuit Judge (dissenting).

In my opinion, the taxpayer, Northeastern Consolidated Company, correctly claimed as a deduction upon its federal income tax return for the taxable year ended March 31, 1956, the $199,791.09 item which represented the unpaid balance of advances made by the taxpayer to Northeastern Electric Construction Corporation (NECCO).

Although the majority's application of the relevant Revenue Code provisions without reference to their subsequent case law treatment may in certain situations aid in determining whether a cash advancement should be classified as a loan or an investment of capital, this technique is not appropriate for solving the problem presented in this case.

That we are not presented with a case of first impression is graphically demonstrated by Byerlite Corp. v. Williams, 286 F.2d 285 (6th Cir. 1960). This important case was heavily relied upon by the taxpayer, but is not mentioned in the majority opinion.

In *Byerlite* the Sixth Circuit held that advances made by the Byerlite Corporation to its subsidiary, the Byerlite Export Company, Ltd., were loans rather than contributions to capital and therefore the taxpayer was entitled to deduct from its ordinary income as a worthless debt the loss of such loans. The situation there presented and the facts in case at bar are compellingly analogous. The only factual difference is that in *Byerlite* the Export Company was a wholly owned subsidiary of the taxpayer whereas here NECCO was not a subsidiary of the taxpayer (although there was common stock ownership of the two corporations). In my opinion, this differ-

ence is without legal significance. In both cases, proper resolution of the tax question depends upon whether the taxpayer's expenditures were proximately related to his business activities. This court must decide whether the taxpayer's expenditure served a recognizable business purpose.

In the course of his opinion, Chief Judge McAllister in *Byerlite* said:

On the books of Byerlite, the advances to Export were carried as accounts receivable; on Export's books, as accounts payable. This is the nomenclature of debt. Of course, the government is not bound in its tax collecting activities by the terminology used by a taxpayer if such terminology is used to disguise something quite different. However, if the stockholders of a corporation determine just how much of their funds they care to risk in the form of capital and how much, if any, they are willing to lend as a credit, and, when the venture is closed up, they take their loss as to such amount as they have loaned, and this leaves them in a position to enjoy more favorable deduction privileges than if they had put it all in as capital, this does not entitle the Commissioner of Internal Revenue to rewrite their balance sheet for them and show to be capital what was intended to be a loan. * * * The decisive factor is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties. * * * The indicia relied upon by the government are not controlling. The fact that advancements to a corporation are made without requiring any evidence of indebtedness or fixing any date for repayment; without requiring the payment of any interest; and with the realization that the tangible assets of the corporation were not such, at any given time during the taxable period, as to repay any part of the loan—was not a controlling consideration requiring a conclusion that the advances were not

loans, and that a deduction from ordinary income for a bad debt was not properly allowable, when the advances became uncollectible.

\* \* \* \* \* \*

From the foregoing, it appears that losses of great sums of money resulting from large loans to corporations with slight capital, and even purchases of stock in corporations, are held not to be investments in capital, where the intent to invest was not present and where the funds were loaned, or stock purchased, only to promote the business purposes of the stock purchaser or lender. (footnotes omitted.) 286 F.2d at 290–291.

There, as here, the Government argued that the advances made by the taxpayer constituted contributions of capital and attempted to support the argument by indulging in various fictions unsupported by the realities of the situation. Judge McAllister's response to the Government's contention is squarely applicable to this case:

In arguing that appellant is not entitled to a bad debt deduction, the government is obliged to contend, as the District Court found, that Byerlite's advances to Export were not loans but were an investment in Export's capital stock. Such a contention is based upon a theory that seems most unreal and artificial. Export had no need to sell stock, and Byerlite had no need to purchase stock to carry out the contemplated operations. To deprive Byerlite of a deduction for a bad debt on the ground that it was investing in Export's stocks, rather than loaning money to Export, would seem to require a complicated, unreal, artificial assumption to be substituted for an ordinary, normal, and regular method of doing business, which, in this case, was characterized by the absence of any motive to operate otherwise than as shown by the records of the two companies, and with no hint of subterfuge or attempt to evade simple, straightforward business practices—

and, certainly, with no thought of advantage in manner of operation, or as to tax consequences. 286 F.2d at 292.

One of the fictions suggested by the Government to support its theory that the advances to NECCO were contributions to capital rather than loans is that the taxpayer was actually a shareholder in NECCO and that the debt carried on the taxpayer's books was in reality an investment. That the Government's position is illogical can be demonstrated by hypothesis. If NECCO had been a successful operation and not only repaid the taxpayer's cash advances but also generated a profit, this profit, would have been distributed not to the taxpayer, but to NECCO's stockholders. The taxpayer would have had no claim to such profit. Under such circumstances would the Government have attempted to tax such profit to the taxpayer? To ask the question is to answer it.

I would reverse the judgment of the district court.