PHILIP E. BAUER AND JOAN BAUER, Petitioners [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bauer v. Commissioner
Docket Nos. 10615-78, 10694-78, 10695-78.
United States Tax Court
T.C. Memo 1983-120; 1983 Tax Ct. Memo LEXIS 669; 45 T.C.M. (CCH) 910; T.C.M. (RIA) 83120; March 7, 1983. Henry Himmelfarb, for the petitioners. Alvin B. Sherron, for the respondent. HAMBLEN
MEMORANDUM OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioner
Taxable Year Ended
Deficiency
Philip E. Bauer and
December 31, 1973
$32,387.00
Joan Bauer
December 31, 1974
12,423.00
December 31, 1975
12,577.00
Federal Meat Company
April 30, 1974
$37,195.80
April 30, 1975
49,683.39
April 30, 1976
38,676.32
Phillip Himmelfarb and
December 31, 1975
$43,824.00
Ruth Himmelfarb
*670 The sole issue for decision is whether certain payments made by petitioners Philip E. Bauer ("Bauer") and Phillip Himmelfarb ("Himmelfarb") to petitioner Federal Meat Company ("Federal") were bona fide loans or contributions to capital. If these payments were loans, then Federal's repayment of principal does not contitute taxable income to Bauer and Himmelfarb, while its payment of interest is taxable to Bauer and Himmelfarb and deductible by Federal. If, however, these payments were capital contributions, then subsequent payments from Federal to Bauer and Himmelfarb constitute taxable dividends. All of the facts have been stipulated and are found accordingly. Petitioners Philip E. Bauer and Joan Bauer, husband and wife, resided in Los Angeles, California, when they timely filed their 1973, 1974, and 1975 joint Federal income tax returns with the Internal Revenue Service Center, Fresno, California, and when they filed their petition in this case. Petitioner Federal Meat Company had its principal place of business in Los Angeles, California, when it timely filed its 1974, 1975, and 1976 corporate Federal income tax returns with the Internal Revenue Service Center, Fresno, *671 California, and when it filed its petition in this case. Petitioners Phillip Himmelfarb and Ruth Himmelfarb, husband and wife, resided in Los Angeles, California, when they timely filed their 1975 joint Federal income tax return with the Internal Revenue Service Center, Fresno, California, and when they filed their petition in this case. Federal was formed on May 1, 1958. Its initial paid-in capital stock was $20,000, and its initial and only stock issuance was 2,000 shares at a par value of $10 each, all of which remain outstanding. Federal is a closely-held corporation in which Himmelfarb and his son-in-law, Bauer, own 100 percent of the stock of the corporation. Of this 100 percent, Himmelfarb owns 75 percent and Bauer owns 25 percent. Federal is a custom slaughterer which is in the business of selling dressed meat to chain store buyers, retailers, and wholesalers. It buys live animals and has them custom slaughtered for fixed fees. There is an approximate three-week operating cycle from the time of slaughter to the time of collection from the sale of dressed meat. Federal does not own a packing house, and it leases its premises and delivery equipment. For the taxable *672 years ended April 30, 1974, April 30, 1975, and April 30, 1976, Federal's operating expenses were, respectively, $2,929,040, $2,678,209, and $3,461,427. Since Federal's incorporation in May 1958 and continuing throughout the taxable years at issue, various amounts of money were transferred between Bauer and Federal and between Himmelfarb and Federal. By the end of calendar year 1958, a total of $102,650 had been advanced to Federal by Bauer and Himmelfarb. A series of payments in both directions followed, such that, as of December 31, 1971, the balance advanced to Federal by Bauer and Himmelfarb totalled $650,068. During the relevant years of 1973 through 1975, the following amounts were transferred between Bauer and Federal: Amount from Federal
Amount from Bauer
Date
(to Bauer)
(to Federal)
July 20, 1973
$ 80,000
July 23, 1973
20,000
July 23, 1973
30,000
August 24, 1973
35,000
December 28, 1973
35,000
January 2, 1974
25,000
July 1974
35,000
January 1975
30,000
March 1975
5,000
March 1975
5,000
July 1975
65,000
July 1975
30,000
Total
$125,000
$270,000
During the same period, the following amounts were transferred *673 between Himmelfarb and Federal: Amount from Federal
Amount from Himmelfarb
(to Himmelfarb)
(to Federal)
July 20, 1973
$170,000
June 6, 1975
250,000
July 11, 1975
350,000
December 10, 1975
200,000
December 31, 1975
75,000
Total
$75,000
$970,000
As a result of the advancement of funds in the form of loans from shareholders, Federal's debt to equity ratio was approximately 5.13 to 1 by the end of 1958. Due to further advances, this ratio had risen to approximately 92 to 1 for the fiscal year ending April 30, 1976. Petitioners treated all of the described transfers between Federal and its shareholders as loans and repayments. Each purported loan was evidenced by a note, "accrued interest payable" was entered in the corporate ledger at the end of each month as an addition to liabilities in the form of "outstanding loans payable - officers," each year's total accured interest was paid within two and one-half months of the close of Federal's fiscal year, and Federal's financial statements included the outstanding balances as a current liability labelled "loan payable - officers." All of the notes evidencing the transfers from Bauer or *674 Himmelfarb to Federal were negotiable promissory notes that were unsecured and payable on demand. The notes carried a stated and reasonable annual interest rate, e.g., seven percent for 1972, 1973, and 1974 and ten percent for 1976. The notes were at no time convertible into stock nor subordinated to any other loan obligation of Federal. In addition to the stated interest payments and principal repayments, Bauer and Himmelfarb received salary payments from Federal. During the years at issue, each received the following salaries: For Taxable Year Ending
Amount of Salary
April 30, 1974
$80,000
April 30, 1975
80,000
April 30, 1976
70,000
No dividends were paid to Bauer or Himmelfarb by Federal. On its corporate tax returns for the taxable years at issue, Federal deducted as business expense all amounts paid as interest to Bauer and Himmelfarb. Bauer and Himmelfarb reported all salary payments as income on their respective individual tax returns for the taxable years at issue. In addition, they reported as income all amounts received from Federal as interest. In his notices of deficiency, respondent disallowed interest expense deductions claimed by *675 Federal because no debtor-creditor relationship had been established to support treatment of the payments as interest. Respondent determined that the payments made by Federal to Bauer and Himmelfarb did not constitute the repayment of loans and interest thereon, but were taxable dividends. Therefore, respondent increased the taxable incomes of Bauer and Himmelfarb by the amounts received from Federal which had been treated as principal repayments, less the $200 joint dividend exclusion allowed to each taxpayer for each taxable year. Respondent asserts that the various advances made to Federal were contributions to capital and, accordingly, that subsequent payments from Federal must be treated as corporate dividends. Petitioners argue that all advances were, in fact, bona fide loans to the corporation. They contend that the use of shareholder loans to provide working capital was a valid economic decision on the part of Bauer and Himmelfarb who "chose to earn the interest which was paid rather than pay the bank the interest." They also contend that shareholder financing was elected, but was not required, because conventional financing was always available as an alternative. [2] *676 General standards for labelling funds as loans or capital contributions are difficult *677 to formulate. Determination of whether a shareholder's interest constitutes debt or equity depends on particular facts and circumstances. [3] Courts have long recognized that: There is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. * * * John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). A variety of characteristics must be identified and weighed in making such determination. Factual variations produce widely differing legal results, as the vast spectrum of case law in this area indicates. That which is considered bona fide debt in one set of circumstances might be viewed as equity investment in another. The outcome must depend upon a balancing of factors pointing in each direction. In striking this balance in any case, "[t]he object of the inquiry is not to count factors, but to evaluate them." Tyler v. Tomlinson,414 F.2d 844, 848 (5th Cir. 1969). *678 In the circumstances now before us, we have considered both those characteristics which petitioners argue support a classification of payments as debt and those which respondent believes compel a classification as equity. On balance, we hold that all monies advanced Federal by Bauer or Himmelfarb during the taxable years at issue are properly classified as equity investments in the form of contributions to capital. The factors leading us to this conclusion are discussed below. First, it is well settled that form alone, although entitled to some weight, does not control the characterization of the true substance of an instrument. Baker Commodities, Inc. v. Commissioner,48 T.C. 374, 395 (1967), affd. 415 F.2d 519 (9th Cir. 1969); Curry v. Commissioner,43 T.C. 667 (1965). Examination is required to ensure that the substance of a transaction complies with its form. Gregory v. Helvering,293 U.S. 465 (1935). We have previously expressed the application of this general legal principle to the very issue which we now confront, and we have said that: The formal characterization as loans on the part of the controlling *679 stockholders may be a relevant factor but it should not be permitted to obscure and true substance of the transaction. [Footnote omitted.] Dobkin v. Commissioner,15 T.C. 31, 33 (1950), affd. per curiam 192 F.2d 392 (2d Cir. 1951); see Schnitzer v. Commissioner,13 T.C. 43 (1949), affd. per curiam, 183 F.2d 70 (9th Cir. 1950), cert. denied, 340 U.S. 911 (1951). Therefore, the mere fact that petitioners cast their transactions in the form of loans and treated the challenged amounts as loans does not require us to find that these sums were, in fact, bona fide loans. Whether a withdrawal constitutes repayment of a bona fide loan is, as noted, a factual question and depends primarily upon the existence of an intent on the shareholder's part to repay at the time the withdrawal is made and the intent of the payor-corporation to enforce the obligation. Harber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Busch v. Commissioner,T.C. Memo. 1983-98. However, where an instrument is not ambiguous on its face, intent is more realistically *680 regarded as a mere restatement of the ultimate issue of substance. This point was made in Tomlinson v. The 1661 Corp.,377 F.2d 291, 299 (5th Cir. 1967): "* * * the issue is not so much what the parties intended, but whether for tax purposes the transaction will be so recognized." See also United States v. Snyder Brothers Co.,367 F.2d 980, 982-983 (5th Cir. 1966). We must look beyond the form of payments in our attempt to distinguish creditor interests from investment interests. The distinction between these two types of economic interests was expressed in our decision in Kolkey v. Commissioner,27 T.C. 37 (1956), affd. 254 F.2d 51 (7th Cir. 1958), in which we explained: The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them.* * * [Italics in original.] 27 T.C. at 58, *681 quoting from United States v. Title Guarantee & Trust Co.,133 F.2d 990, 993 (6th Cir. 1943). In other words, repayment of a loan is not conditioned upon business success, whereas return of capital depends upon corporate performance. Where the chances of repayment are linked to the financial success of the recipient corporation, equity interests have been found. See, e.g., Dobkin v. Commissioner,supra;Affiliated Research, Inc. v. United States,351 F.2d 646 (Ct. Cl. 1965); American Processing and Sales Co. v. United States,371 F.2d 842 (Ct. Cl. 1967). In determining the substance of a shareholder's interest, it is necessary to consider the impact of any advancement upon the corporate recipient.The Court of Appeals for the Second Circuit analyzed this aspect in Gilbert v. Commissioner,248 F.2d 399, 406-407 (2d Cir. 1957), remanding a Memorandum Opinion of this Court, wherein the Court explained: From the point of view of the corporation, the Code allows a deduction for "interest paid * * * on indebtedness," yet it allows no deduction for dividends paid. Thus, where a corporation pays *682 for the use of money which it will return, it is in effect allowed a deduction for a business expense, just as it is allowed a deduction for the expense of renting a building. Where, however, a corporation pays dividends, it is not incurring a business expense; it is distributing profits. While interest and profits are not always distinguishable, they are distinct concepts, and the distinction, however imperfect it may be in a particular case, lies in the degree of risk involved. Thus, it would do violence to the congressional policy to permit an "interest" deduction where the "loan" is so risky that it can properly be regarded only as venture capital. The relationship of "nominal stock investments" or "an obviously excessive debt structure, * * * to the degree of risk involved is clear. Any "loan" to the corporation in such circumstances would necessarily be venture capital in reality, for any business loss by the corporation would be reflected in an inability to repay the "loan." Furthermore, we believe that Federal's debt-equity ratio indicates that it was undercapitalized. No mathematical threshhold exists to provide a clear-cut answer to the question of what ratio of *683 debt to equity is permissible. In some cases, a ratio of only 4 to 1 has been found excessive, Briggs Co. v. Commissioner, a Memorandum Opinion of this Court dated May 14, 1946 (in light of surrounding financial circumstances, this ratio "in all probability would not be favorably considered by prospective creditors"); at the other extreme, a ratio of 700 to 1 has been upheld as justified, Baker Commodities, Inc. v. Commissioner,supra (cash flow and earnings power found sufficient to support payments). Numbers alone are not determinative, but must be viewed in the context of underlying business purposes and industry norms. For exemple, what might otherwise have been held to be excessive debt was found to be reasonable under the circumstances in Jack Daniel Distillery v. United States,379 F.2d 569 (Ct.Cl. 1967). In that case, a parent corporation borrowed large amounts from a bank and, in turn, lent the borrowed monies to a newly-incorporated subsidiary. The loans were justified as necessary where the shareholders of a defunct predecessor corporation refused to sell its assets to the parent. Under similar reasoning, large loans were *684 upheld as bona fide loans where a parent corporation's purpose in organizing and lending money to a subsidiary was not to gain any tax advantage, but to avoid risking its own assets in the uncertain political climate of a colonial territory. Byerlite Corporation v. Williams,286 F.2d 285 (6th Cir. 1960). Under yet another of the many acceptable business rationales advanced by taxpayers, a corporation's debt structure was justified by the desire to incorporate a separate division in order to confine the mandatory election of a union bargaining agent. American Processing and Sales Co. v. United States,371 F.2d 842 (Ct.Cl. 1967). The above cases, representative of the many that have dealt with the issues of undercapitalization and excessive debt, provide examples of the types of factually specific considerations which have persuaded courts of the reasonableness of high debt. In many other cases, the absence of persuasive justification has contributed to conclusions that shareholder advances were not true debt. See, e.g., United States v. Henderson,375 F.2d 36 (5th Cir. 1967), cert. denied, 389 U.S. 953 (1967); Northeastern Consolidated Co. v. United States,406 F.2d 76 (7th Cir. 1969), *685 cert. denied, 396 U.S. 819 (1969). No business justification for the excessive debt in Federal's capital structure has been advanced by petitioners. Petitioners have argued that, from the personal standpoints of Bauer and Himmelfarb, it made sense to collect interest rather than to allow a bank to collect it. Even if sincere, this motivation is not akin to the business purposes described in the representative decisions. Our focus must be on the search for a business reason for Federal's undercapitalization, not for Bauer and Himmelfarb's personal money management. Absent any such explanation from Federal's viewpoint, we find that debt to equity ratios which reached 5 to 1 in the year of incorporation and rose to 92 to 1 thereafter are unreasonable and lend credence to respondent's argument that purported shareholder loans were, in fact, disguised capital contributions. Excessive debt is particularly suspect where shareholder advances are made during the formative stages of corporate existence. Purported loans which might otherwise withstand scrutiny have been reclassified as equity investments where proceeds were used "for meeting expenses needed to commence *686 operations." United States v. Henderson,supra at 40; see also Schnitzer v. Commissioner,supra.[4] Under the facts before us, Federal was capitalized with only $20,000. Within eight months of Federal's incorporation, Bauer and Himmelfarb had advanced sums totalling $102,650. These figures strongly suggest that the shareholder advances were necessary to provide operating capital with which to commence Federal's corporate life. Petitioners' position is further undercut by the fact that a series of advances were made over a period of more than 18 years, including 11 separate occasions during the relevant years of 1973 through 1975. A pattern of repeated shareholder advances, as opposed to a single outlay, suggests that the funds are needed as working capital and, therefore, that an equity investment has been made. See, e.g., Green Bay Structural Steel, Inc. v. Commissioner,53 T.C. 451, 458 (1969), in which a finding of bona *687 fide debt was specifically distinguished from "a situation of repeated advances by stockholders to the corporation to keep it going." See also, Jack Daniel Distillery v. United States,supra; in contrast, see, e.g., United States v. Henderson,supra;Affiliated Research, Inc. v. United States,supra.
The respective amounts advanced by Bauer and Himmelfarb also warrant consideration. Where shareholder advances are proportionate to their equity interests, this is strong evidence of capital contribution. Proportional amounts indicate a sharing of financial risk akin to stock ownership; see, e.g., Gilbert v. Commissioner,supra;Gooding Amusement Co. v. Commissioner,23 T.C. 408 (1954), affd. 236 F.2d 159 (6th Cir. 1956), cert. denied, 352 U.S. 1031 (1957); on the other hand, disproportionate amounts support a finding of bona fide loans; see, e.g., Green Bay Structural Steel, Inc. v. Commissioner,supra;Curry v. Commissioner,supra.In the instant case, Bauer advanced a total of $270,000 to Federal during the *688 years in issue, while Himmelfarb advanced a total of $970,000. These amounts were not precisely proportional to their 25 percent and 75 percent respective ownership interests in Federal.However, mathematical exactitude is not necessary to raise doubts as to the bona fidencess of purported loans. Under these facts, we find that the actual advancement percentages of 21.8 percent and 78.2 percent, respectively, were close enough to the stock ownership percentages of 25 percent and 75 percent to invite suspicion. [5]
Finally, the absence of any fixed maturity dates on the demand notes held by Bauer and Himmelfarb negates petitioners' contention that repayment of debt was fully contemplated. Cf., United States v. Henderson,supra;Motel Corp. v. Commissioner,54 T.C. 1433 (1970). *689 The significance of this factor is buttressed by Federal's repayment history. During the relevant period, as well as during the more than 14 years prior thereto, the repayment of outstanding amounts never kept pace with the additional advances. Upon consideration of the above factors, we have concluded that the advancement of funds to Federal by Bauer and Himmelfarb were capital contributions. In reaching this determination, we have, of course, considered and counterbalanced those opposing factors which weigh in petitioners' favor. These factors include the existence of notes; set and reasonable interest rates; actual payment of interest, and the corresponding treatment of interest as income by Bauer and Himmelfarb; the business cycle of the custom slaughter business; and the lack of subordination of shareholder debts to other corporate debts. [6] While we agree that these factors are favorable to petitioners, we are convinced by and reach our conclusion on the basis of the more persuasive characteristics in respondent's favor. *690 Furthermore, despite petitioners' protestations to the contrary, the fact that Federal subsequently repaid all of the outstanding balances does not require us to reach a different conclusion. Throughout the years in issue, [7] Federal's debt-to-equity ratio continued to rise, and at no time did the flow of payments from Federal to its shareholders balance or exceed the flow in the opposite direction. The subsequent repayment by Federal may have been motivated by business considerations or may have resulted from a desire to cure its debt structure in anticipation of the controversy now before us. In either event, such remedial action does not erase the clear pattern of 18 years of continual advances without adequate repayment. Moreover, the question of whether the funds advanced by Bauer and Himmelfarb could instead have been obtained from outside sources has been argued at length by both parties to this controversy. In support of their argument that the use of shareholder loans was a prudent business choice but not a capitalization *691 ncessity, petitioners have introduced a letter from the Bank of America expressing the bank's retroactive willingness to provide financing for Federal. Putting aside the procedural and evidentiary objections which respondent has raised to this document, [8] the bank's opinion of Federal's credit worthiness could not alter our resolution of this case. Where outside financing is available but its terms are less attractive than those offered by shareholders, then the factor of available alternative financing must be given decreased weight. See Tomlinson v. The 1661 Corp.,supra. In the instant case, even if the amounts which the bank might have been willing to lend equalled the amounts advanced by Bauer and Himmelfarb, the terms of any bank loans would be unlikely to duplicate the very favorable terms offered by the shareholders. Nothing in the bank's assurance, nor in any other evidence presented suggests that anyone aside from Bauer or Himmelfarb would have been willing to repeatedly advance large amounts of unsecured funds to Federal without any plan for repayment or any indication that repayment was realistically possible from the corporate assets. Therefore, the Bank *692 of America letter does not support a finding that comparable financing was available to Federal from outside sources. Finally, petitioners have argued that, if we find that the payments made by Federal to Bauer and Himmelfarb did not constitute the repayment of loans, such payments cannot be treated as taxable dividends because Federal lacked sufficient earnings and profits to support the payment of dividends as defined under section 316, Internal Revenue Code of 1954, as amended. We, however, must reject this argument since petitioners failed to introduce any evidence to establish that Federal lacked sufficient earnings and profits to support the treatment of the payments as taxable dividends. We have considered other arguments advanced by petitioners and found them to be unpersuasive. Accordingly, we hold that all funds advanced to Federal by Bauer or Himmelfarb during the taxable years in issue were capital contributions and not bona fide loans, and, therefore, the payments made by Federal to Bauer and Himmelfarb during the years in issue constituted taxable dividends. To reflect the foregoing, Decisions will *693 be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Federal Meat Company, Docket No. 10694-78; Phillip Himmelfarb and Ruth Himmelfarb, Docket No. 10695-78.↩
2. In support of this premise, petitioners have offered a letter from D. A. Mullane, Vice President and Manager of the City of Commerce office of the Bank of America, dated October 20, 1980, expressing the Bank's retroactive willingness to have lent Federal amounts equal to or in excess of all outstanding balances for "officer loans" during the relevant years. The parties have stipulated "that if D. A. Mullane were called to testify on behalf of the petitioner he would testify as to the contents of the October 20, 1980, letter," but have further stipulated that the letter "is not being offered for the truth of the matter stated therein and that each party reserves the right to appropriate hearsay objections." Respondent has objected to the admission of the letter as evidence of petitioner's ability to obtain outside financing. We hold that the letter is not admissible for the purpose for which petitioners have attempted to introduce it. While so holding, we note that, even if admitted, the contents of the letter would not alter our decision of this case for the reasons discussed in this opinion.↩
3. Sec. 385(a), Internal Revenue Code of 1954, as amended, authorizes the promulgation of regulations for determining whether an interest in a corporation is stock or indebtedness, and sec. 385(b), I.R.C. of 1954↩, as amended, suggests factors which, among others, may be included in said regulations. However, as of the date of this opinion, final regulations have not been promulgated.
4. This factor has been given added weight where initial advances are made to new businesses with unproved earning ability. See Irbco Corp. v. Commissioner,T.C. Memo. 1966-67↩.
5. The parties have stipulated that: "The 'loans' or 'contributions to capital' by petitioners Phillip Himmelfarb and Philip Bauer were not in proportion to their respective stock interests in the petitioner Federal Meat Company." While the stipulation is technically correct, it is clear that the respective amounts advanced by Bauer and Himmelfarb did not differ significantly from their proportionate stock interests.↩
6. The lack of subordination, while relevant, has little persuasive value in the absence of evidence of any other corporate debt to which shareholder loans could have been subordinated, as is the case here.↩
7. The parties have stipulated as to the fact of repayment, but no evidence has been offered as to the dates or circumstances of repayment.↩
8. See foonote 2, infra.↩