**BYERLITE CORPORATION, Plaintiff-Appellant,**

v.

**Parker C. WILLIAMS, District Director of Internal Revenue, Eighteenth District of Ohio, Defendant-Appellee.**

No. 13877.

United States Court of Appeals
Sixth Circuit.

Dec. 15, 1960.

David R. Hertz, Hertz & Kates, and Samuel K. Walzer, Cleveland, Ohio, for appellant.

I. Henry Kutz, Atty., Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Melvin L. Lebow, Attys., Dept. of Justice, Washington, D. C., and Russell E. Ake, U. S. Atty., Cleveland, Ohio, on the brief), for appellee.

Before McALLISTER, Chief Judge, POPE, Circuit Judge, and THORNTON, District Judge.

McALLISTER, Chief Judge.

Plaintiff paid income and excess profits taxes for 1949 and 1950 under protest, and brought this action to recover them. It contended that certain advances which it made to an affiliated corporation were loans; that these loans were not repaid; that they, therefore, constituted a bad debt; and that, accordingly, they were deductible, as a bad debt, from plaintiff's ordinary income, under Section 23 (k) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(k).

The District Court held that the advances in question from plaintiff to its affiliated corporation were not loans but,

rather, were an investment in the stock of the affiliated corporation, and, therefore, a capital investment therein; that, by virtue of various sections of the Internal Revenue Code, the particular loss, in this case, resulting from such investment and capital asset, was not deductible from plaintiff's ordinary income; and the District Court, accordingly, dismissed the complaint.

The background of the case is as follows: Commencing in 1931, plaintiff Byerlite Corporation engaged in the manufacture and sale of asphalt and allied products. The shares of stock in Byerlite were, and are, held by members of the Myers family, who also manage and direct its business. D. N. Myers is President; Inez Myers, his wife, is Vice President; and Milton Myers, his brother, is Secretary and Treasurer.

In February, 1947, plaintiff Byerlite Corporation learned of the availability of asphaltic materials on the island of Aruba, in the Netherlands West Indies. These asphaltic materials had accumulated from the dumping of oil refinery residue on the property of the Lago Oil and Transport Company, a Canadian corporation. This latter company was an affiliate of the Standard Oil Company of New Jersey. Byerlite, after making an examination of these asphaltic materials, commenced negotiations to purchase them from the Lago company.

On May 7, 1947, a contract of sale of the asphaltic materials was executed between the Byerlite company and the Lago company. According to the contract, Byerlite agreed to purchase and remove a minimum of 600,000 tons of asphaltic pitch, of which 200,000 tons were to be purchased and removed within three and a half years of the date of the contract, and the balance was to be purchased and removed at the rate of not less than 70,000 tons per year. It was understood that all of the asphaltic materials would be removed within a few years, and, in no event, later than ten years after the contract date.

Shortly after the execution of the contract, Byerlite commenced preparations for the removal of the asphaltic materials. Equipment, machinery, and other properties were purchased and shipped to the island of Aruba. About that time, it occurred to the Byerlite company that it would be advisable to organize a subsidiary corporation, the only function of which would be to carry on the operations necessary to prepare the asphaltic materials for shipment. Byerlite's reason for considering that a subsidiary corporation should be organized arose out of the state of political uncertainty in the world, at that time, affecting colonial governments, and, especially, in this case, the Dutch colonial government. Colonial governments were then toppling and disappearing in all parts of the world, and the Dutch were experiencing much of the brunt of this great political change in their colonies. Because of these circumstances, Byerlite desired to avoid risking all of its corporate resources to the liabilities resulting from an operation in a foreign country under Dutch colonial government.

On September 16, 1947, therefore, a subsidiary corporation was organized by Byerlite, and incorporated under the laws of the Dominion of Canada, under the name of the Byerlite Export Company, Ltd., which will hereafter be referred to as "Export." The authorized capital of Export was 10,000 shares, having a par value of $5.00 per share. However, only 6 shares of Export were ever issued, and they were issued to Byerlite for the sum of $30.00; but no certificates of stock were ever issued by Export, nor did it possess a stock certificate book.

In formulating the idea of a subsidiary corporation, and in conducting the business at Aruba through such an organization there, the Byerlite company did not contemplate tax evasion, or tax avoidance, or tax savings; it gained no operating advantage by conducting part of its business through the subsidiary; and it, further, gained no operative advantage by the use of a foreign, rather than a domestic, subsidiary. Its sole purpose, according to the evidence, was to avoid

risking all of its assets and resources, used elsewhere, to perilous losses that might result from this relatively minor operation. In brief, then, in organizing Export, the purpose which Byerlite company had in mind was to avoid losing all it possessed, as a result of doing business under a colonial government, at a time when such governments were disappearing, or being overturned by revolution in many parts of the world.

The object and effect of the Byerlite company's organization of its affiliate, Export, was to separate the operation of securing the asphaltic materials from the Lago company into two parts: (1) Export was to carry out the minor operation of removing the asphaltic materials from the premises of the Lago company, and providing island transport of the materials to a port in Aruba from which they could be shipped. (2) Byerlite was to finance the whole project and provide for the trans-shipment and sale to third parties. Thus, Byerlite was to purchase the asphaltic materials and pay the Lago company for them. It was to pay to Export, all the expenses in removing the materials, preparing them for shipment, and transporting them to a seaport. It was further to bear the cost of shipment of the materials from the island of Aruba to the place of destination, and to sell and collect from the eventual buyers.

The President of the Byerlite company considered that it would require an expenditure, on Byerlite's part, of approximately $125,000 to commence operations in the island of Aruba, including the cost of the purchase of equipment, machinery, and other items for the removal of the asphaltic materials. Prior to the incorporation of Export, the Byerlite company had paid out of its own funds $88,000 for these purposes. The amount of these expenses was thereafter entered on the books of the Byerlite company as an advance, and was recorded on the books of Export as an account payable to the Byerlite company.

At the time Export was organized, it was estimated that additional expenditures in large amounts for machinery, equipment, and other items would be required to be advanced by the Byerlite company to Export for the purpose of removing the asphaltic materials and preparing them for shipment from a port in Aruba. Such expenditures were thereafter advanced by the Byerlite company, and charged to Export as loans.

The Byerlite company, at the time it entered into the contract with Lago company for the purchase of the asphaltic materials, considered that the contract with the Lago company was a valuable asset. This assumption was based upon the belief that there were markets in Spain, Sweden, France, and Italy for the asphaltic materials, which, in those countries, are used for the manufacture of fuel in the form of coal briquettes. It was further assumed that the selling price of the asphaltic materials in those foreign countries would be approximately $24.00 per ton; that the cost of removing, preparing, selling, and shipping the materials would be $20.00 per ton; and it was expected, accordingly, that, on the total of 600,000 tons, there would be a yield of profit on the entire transaction of $2,400,000. The Byerlite company expected to ship about 200,000 tons of the material the first year.

The original plan called for the payment by the Byerlite company to Export of a service fee of $1.50 per ton over and above the expected cost of operation for removing and preparing the material for shipment. It was from these service fees, payable to Export, that the Byerlite company expected to receive back the money which it advanced to Export to carry out the operations assigned to it.

The Byerlite company had, and retained as its own, its contract with the Lago company, the vendor of the materials, and was to receive all profits over and above the sum of $1.50 per ton. As stated above, this amount was to be retained by Export as a service fee. But from the aggregate of these service fees of Export, the Byerlite company was to be repaid for its large advances to Export, which the latter company had received

for the purpose of the removal and preparation of the materials for shipment. The foregoing was the original plan of the Byerlite company and the Export company. It was subsequently somewhat modified, as hereafter appears, but with no effect upon this case.

Byerlite's contract with the Lago company, shortly after its execution, appeared extremely valuable—and later dropped to utter worthlessness, resulting in an enormous loss to Byerlite. The drama of this remarkable rise and fall of a promising business venture does not directly bear upon the issues in this case, but is part of the story that accounts for the disaster suffered by Byerlite, and the reasons why it is asking to deduct the loss from income on its tax return.

It developed, then, that within a year of the date of the execution of the contract between the Byerlite company and the Lago company, another Ohio corporation, the Great Lakes Carbon Co., heard of the enterprise, and became greatly concerned in acquiring an interest in it. On April 12, 1948, the Great Lakes company offered to purchase a 50% interest in Export, the subsidiary, for $250,000, and further offered to advance $500,000 by way of loans to the subsidiary, upon certain conditions. One of these conditions was that the Byerlite company's contract with the Lago company was to be assigned to the subsidiary corporation, or to a new corporation; that, further, at the time of the acceptance of the above offer, Byerlite would have advanced or made available to the subsidiary the aggregate sum of $500,000 to be used for the purchase of machinery and equipment; that $300,000 of the aggregate of $500,000, which had been advanced by Byerlite, would be repaid to Byerlite out of the $500,000 advanced by Great Lakes; and that the advances by both Byerlite and Great Lakes were to be covered by promissory notes. It was a further condition that Great Lakes was to have direct management of the company's sales and operations, and to receive a commission of $1 per ton on all the asphaltic materials sold.

The net effect of this offer of Great Lakes, if accepted by Byerlite, would have been as follows: Byerlite's total financial investment would have totalled $500,000. In return for 50% interest in the enterprise, Great Lakes would invest $750,000. Of this $750,000, Byerlite would be paid $250,000 for a share of its interest in the subsidiary, and $300,000 as a payment for the advances which Byerlite had made to the subsidiary. In other words, it would receive a total of $550,000 from Great Lakes—which was $50,000 more than would have been its investment in the enterprise. Thereafter, Byerlite and Great Lakes would each own 50% of the enterprise, and the profits would be equally divided between Byerlite and Great Lakes, after Great Lakes had first realized profits from the operations to the extent of $500,000. By this agreement, then, Byerlite would be repaid $500,000—the entire amount it had invested in the enterprise, plus $50,000. Great Lakes would invest $750,000, which it would attempt to recoup by profitable operations, to the extent of $500,000, before sharing profits with Byerlite. Thereafter, Great Lakes, with $250,000 still invested in the company, would share the profits equally with Byerlite.

Byerlite refused the Great Lakes offer as not being adequate. Soon thereafter, it developed that the foreign companies to which Byerlite intended to sell the asphaltic materials would be unable to make payment in American dollars and it became evident that, because of some unexplained circumstances, the demand in those countries for the asphaltic materials disappeared. Immediately, then, it became necessary to look to the American market for customers. But, here, the results were disappointing, and the prospects almost hopeless, since it soon became apparent that the cost of preparing the material for the American market was 150% higher than for the foreign markets. Accordingly, only a few sales were made.

Thereafter, Export, because of expediency, made a few sales of the asphaltic

materials to other purchasers instead of making all of its sales to Byerlite. It then rented its buildings in Aruba, as well as its equipment, and rendered services to others through the use of its equipment and employees.

The future seemed to hold little hope for the venture. Export operated at a substantial loss each year of its existence. Nevertheless, the Byerlite company continued to make advances, shown on its books as accounts receivable, and on Export's books, as accounts payable. In December, 1950, after a little more than three years of existence, Export, according to its books, owed Byerlite $564,661.72 [1]

Thereafter, in December, 1950, the Lago company cancelled its contract with Byerlite because of the failure of Byerlite to purchase a minimum of 200,000 tons of the asphaltic materials within three and one-half years from the date of the contract, as therein provided. Shortly thereafter, Export was dissolved. Its assets were transferred to Byerlite. The gross value of these assets was $121,695.10. The Byerlite company contends that this amount, representing the gross value of Export's assets, should be deducted from the amount of the advances made by Byerlite to Export, which would result in the difference of $442,966.62, which Byerlite lost by reason of such advances, and which Byerlite claims it is entitled to deduct from its ordinary income in 1949 and 1950 as a bad debt.

The Director of Internal Revenue held that the advances by Byerlite to Export were not loans, but were contributions to capital, on which no deductions were allowable. The Director's ruling resulted in the payment by the Byerlite company, under protest, of $116,257.91. Appellant then brought suit to recover such payment and in the District Court, the ruling of the Director was sustained; and the Byerlite company has appealed from such holding and judgment.

Although numerous issues were submitted to, and decided by, the District Court, there appears to us only one controlling question in the case: Were the advances made by the Byerlite company to the Export company loans? If they were loans, Byerlite is entitled to deduct the loss on such loans as a bad debt loss, from its ordinary income.

On the books of Byerlite, the advances to Export were carried as accounts receivable; on Export's books, as accounts payable. This is the nomenclature of debt. Of course, the government is not bound in its tax collecting activities by the terminology used by a taxpayer if such terminology is used to disguise something quite different. However, if the stockholders of a corporation determine just how much of their funds they care to risk in the form of capital and how much, if any, they are willing to lend as a credit, and, when the venture is closed up, they take their loss as to such amount as they have loaned, and this leaves them in a position to enjoy more favorable deduction privileges than if they had put it all in as capital, this does not entitle the Commissioner of Internal Revenue to rewrite their balance sheet for them and show to be capital what was intended to be a loan. Rowan v. United States, 5 Cir., 219 F.2d 51. The decisive factor is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties. United States v. Title Guarantee & Trust Co., 6 Cir., 133 F.2d 990; Gooding Amusement Co. v. Commissioner, 6 Cir., 236 F.2d 159. The indicia relied upon by the government are not controlling. The fact that advancements to a corporation are made without requiring any evidence of indebtedness or fixing any date for repayment; without requiring the payment of any interest; and with the realization that the tangible assets of the corporation were not such, at any given time during the taxable period, as to repay

---

[1]. Of this amount, the President of Byerlite, D. N. Myers, had loaned $277,500 to Byerlite, which, as the Court found,

"loaned the money received by it from Myers to Export."

any part of the loan—was not a controlling consideration requiring a conclusion that the advances were not loans, and that a deduction from ordinary income for a bad debt was not properly allowable, when the advances became uncollectible. Lucia Chase Ewing v. Commissioner, 5 T.C.M. 908. Similarly, where a lender was the sole stockholder of the borrowing corporation, the business of which was not prospering, and a substantial part of the money borrowed was used by the corporation for the acquisition of capital assets, the court held that these circumstances, relied upon by the Commissioner, were not sufficient to constitute the advancements a contribution to capital, and were not a basis for disregarding the true intention of the parties to create debts. Alma Spreckels v. Commissioner, 8 T.C.M. 1113. Moreover, when a partnership acquires capital stock in a corporation in order to help obtain liquor needed in the partnership business, consisting of the sale of liquor for profit, it was held that the stock was purchased without investment intent, but only for business purposes, Hogg v. Allen, D.C.Ga., 105 F.Supp. 12, affirmed Edwards v. Hogg, 5 Cir., 214 F.2d 640, and where a taxpayer was required to purchase shares of stock in one of its supplier corporations in order to obtain merchandise which otherwise would go to a competitor, the court ruled that it was not an investment, even though carried on the taxpayer's books as an "investment account." The court held that the stock was acquired without investment purpose and only for the taxpayer's business purposes and, hence, was deductible as a business expense. Smith & Welton, Inc. v. United States, D.C.Va., 164 F. Supp. 605.

From the foregoing, it appears that losses of great sums of money resulting from large loans to corporations with slight capital, and even purchases of stock in corporations, are held not to be investments in capital, where the intent to invest was not present and where the funds were loaned, or stock purchased, only to promote the business purposes of the stock purchaser or lender.

It is difficult for us to draw any conclusion to the effect that the advances from Byerlite to Export were intended as capital investments in Export. The advances were made to continue and promote the business of Byerlite in selling asphaltic materials. The transaction was intended to be of short duration by all the parties, Byerlite, Export, and the Lago company. There is no charge here, of mala fides; there was no intent to evade or avoid taxes, or to secure tax benefits. There is no reason to consider that Byerlite did not act in accordance with the facts, when it entered the advances to Export on its books as accounts receivable, and Export, on its books as accounts payable. Moreover, the fact that Export was required to repay Byerlite's advances by the delivery of the asphaltic products, and that Export actually did receive credits from Byerlite for such delivered materials, is a further indication that the advances were intended to be treated, and were treated, as accounts receivable by Byerlite, and as a debt by Export, in the same manner in which they had been treated from the time of the inception of the project three years before.

All of the foregoing circumstances cogently point to the existence of a bona fide debt, and to the conclusion that Byerlite's advances to Export were not investments by Byerlite in the capital stock of Export.

The cases hold that, for tax purposes, transactions are to be disregarded if they are a sham or masquerade, or if they take place between taxable entities which have no real existence. "The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact." Kraft Foods Co. v. Commissioner, 2 Cir., 232 F.2d 118, 128. In all cases, the prevailing consideration is that artifice must not be exalted over reality, whether to the advantage of the taxpayer, or to the government.

In arguing that appellant is not entitled to a bad debt deduction, the government is obliged to contend, as the District Court found, that Byerlite's advances to Export were not loans but were an investment in Export's capital stock. Such a contention is based upon a theory that seems most unreal and artificial. Export had no need to sell stock, and Byerlite had no need to purchase stock to carry out the contemplated operations. To deprive Byerlite of a deduction for a bad debt on the ground that it was investing in Export's stock, rather than loaning money to Export, would seem to require a complicated, unreal, artificial assumption to be substituted for an ordinary, normal, and regular method of doing business, which, in this case, was characterized by the absence of any motive to operate otherwise than as shown by the records of the two companies, and with no hint of subterfuge or attempt to evade simple, straightforward business practices—and, certainly, with no thought of advantage in manner of operation, or as to tax consequences.

In its claim that the debts as shown on the books of Byerlite and Export were, in reality, payments from Byerlite to Export for the latter's stock, the government cites United States v. Title Guarantee & Trust Co., 6 Cir., 133 F.2d 990, 993:

> "The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them."

In its comment on the above, the government says: "In other words, the stockholder intends to make an investment and take the risks of the venture, while the creditor seeks a definite obligation, payable in any event."

But it does not help in the solution of the problem to speak of the man who invests in stock of a corporation as the one who takes the risks and the creditor as the one who seeks a definite obligation, payable in any event. One who makes a loan to a corporation also takes a risk, and while he may receive evidence of an obligation, payable in any event, often such obligation is never paid. "To say that the advances were 'gambled' and placed at the risk of the business does not help * * *. All unsecured loans involve more or less risk. On all available information, the risk here was a good one. And it cannot be said, in contravention of the testimony at the trial, that the holders * * * had no reasonable expectation that they would be repaid." Earle v. W. J. Jones & Son, Inc., 9 Cir., 200 F.2d 846, 851.

To recapitulate other circumstances that, in the aggregate, clearly show that the advances by Byerlite were not intended by Byerlite and Export to be an investment in the latter's stock, and were never so considered by the parties, it is to be observed: The transaction was, in form, a loan; it was not adopted as a device for tax evasion, tax avoidance, or even tax benefits; the reason for choosing the debt terminology, "accounts receivable" and "accounts payable," was unrelated to taxes; the transaction was not directed to the subscription of a small investment in the capital stock of the affiliate when a large investment in its stock was required for the operation; the transaction did not supply capital investment which was needed, under the guise of a loan without requiring or expecting payment; the enterprise required only minimum financing for a few years and not a more permanent structure; the description of the advances as accounts payable was used to express the requirement and anticipation that they would be repaid within a few years, as a debt is required and anticipated to be repaid, since, as the District Court found, it was expected by all parties involved that the entire operation would be concluded within a few years of the time

of its inception; appellant was pursuing only an operating profit which was related to its business of processing and selling asphaltic materials; the risk of the entire venture had been assumed, by contract, by appellant, before the subsidiary was organized; appellant gained no operative advantage by conducting its business through the subsidiary; it gained no operative advantage by the use of a foreign, rather than a domestic, subsidiary; appellant's risk for the entire venture continued throughout the period of operations of the subsidiary and throughout the period of the advances made to it; the purpose of the advances was to carry on appellant's business; appellant's risk of its money would have been the same if it had carried on the operation itself, as it was when carried on through the operation of its subsidiary; the subsidiary was required to repay appellant's advances with asphaltic products to be removed from the premises of the Lago company and turned over to appellant; the books of Byerlite and Export showed not only advances to Export, but credits against those advances for goods sold and delivered by Export to Byerlite.

In form, as well as in reality, all of the risk in the entire venture was the risk Byerlite assumed for the purpose of conducting its business. From the evidence, it could not be said that Byerlite intended, or, at any time, was intending to make an investment in Export in order to enjoy Export's chances of profits as there never appears to have been any prospect of Export's making any profit. As far as the evidence discloses, everything that Export would receive in the way of service fees of $1.50 a ton would not repay the advances which Byerlite would be obliged to make to Export to enable it to remove the materials, prepare them for shipment, and carry them to a port for trans-shipment. The total of the service fees to be retained by Export at $1.50 a ton on the entire 600,000 tons contemplated in the contract would amount to $900,000, which Export would

have to return to Byerlite to the extent of the amounts advanced. From the record, we have no way of knowing how many tons of the material were removed by Export and delivered to Byerlite during the three years of its existence. Certainly, there was only a mere fraction of the total of 600,000 tons actually delivered. $31,879.09 represented the aggregate of Export's sales to Byerlite, as well as to the other parties to whom it sold in trying to delay the final debacle. Byerlite, during this three-year period, advanced to Export $564,661.72, for which it received, at most, a few thousand tons of the asphaltic materials. This suggests, remotely, an approximation of what it would have cost Byerlite to enable its subsidiary to remove, prepare, and deliver 600,000 tons of the asphaltic materials to Byerlite. Nothing in the evidence justifies any conclusion, or belief, or inference, that Byerlite's advances to Export were not loans or that they were intended as an investment by Byerlite made for the sake of enjoying the chances of profit that Export was expected to clear on the transaction.

Nothing could be more unreal, as we look at the whole operation, than to draw the conclusion that Byerlite's advances were intended as investments in Export's capital stock. The risk of loss which was assumed by Byerlite was not assumed so that it could enjoy the chances of Export's profits; that risk was taken in carrying on its business in the procurement and sale of asphaltic materials; and there was never any attempt by Byerlite to avoid that risk, which it carried from the time of the inception of the contracts with the Lago company—before Export had even been organized—to the conclusion of the Lago project. The risk in the venture which Byerlite sought to avoid was not on the operation of removing and selling the asphaltic materials from the property of the Lago company on the island of Aruba; the risk it sought to avoid was the risk "of all its resources in an operation in a foreign country under Dutch colonial administration."

In the presence of circumstances showing a usual course of business, as reflected on the books of a taxpayer, and in the absence of any circumstances from which sham could be inferred, it is only by artifice and fiction that a conclusion could be drawn that the circumstances are not what they purport to be and that what appears from all the evidence to be loans is to be interpreted as an investment in stock.

There are no circumstances in this case to indicate that the carrying of the advances on the books of the companies as "accounts receivable" and "accounts payable" was a sham or masquerade, or that it did not comport with the actual facts. The transactions in question were those which persons or corporations would be likely to carry out in the usual normal and ordinary course of doing business, just as they, here, appeared to be.

How to define the form of the test that the court should adopt to determine whether an advance of funds to a corporation is to be considered a loan or an investment in the corporation's capital stock is fraught with difficulty, as seen in Gilbert v. Commissioner, 2 Cir., 248 F.2d 399.

■ However, it can be said that when, upon the entire evidence surrounding the transaction and the consideration of all indicia, including the possible motives of the parties, the nature of the advantages sought, or the detriment attempted to be avoided, as well as the consideration whether the transaction appears to conform with reality, or resembles a hollow form, an appellate court comes to the definite and firm conviction either that a loan was intended or a capital investment was intended, and that the intent was transmuted into reality—the judgment of the appellate court must follow in accordance with its conclusion, in spite of the contrary findings of a trial court. See United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.[2]

■ It is our firm and definite conviction that the evidence clearly discloses that the advances by Byerlite were loans to Export, and that Byerlite is entitled to the claimed deduction as a bad debt loss. The identifiable event was the cancellation of the Lago contract, upon the happening of which Byerlite sustained its loss. Our determination makes unnecessary the consideration and disposition of many interesting, intricate, involved, and technical problems, ably presented by counsel, and skillfully resolved by the trial court.

In accordance with the foregoing, the judgment is set aside and the case remanded for entry of judgment in favor of appellant, in accordance with this opinion.

2. To similar effect, see Peurifoy v. Commissioner, 358 U.S. 59, 60, 61, 79 S.Ct. 104, 105, 3 L.Ed.2d 30, in which it is said: "Resolution of this case as presented to us turns, therefore, upon a narrow question of fact—Was the petitioners' employment 'temporary' or 'indefinite'? The Tax Court, stating that 'each case must be decided upon the basis of its own facts and circumstances,' * * * found that their employment was temporary. The Court of Appeals, also recognizing that the question was 'one of fact,' held that on the record the Tax Court's finding of temporary employment was 'clearly erroneous.' 254 F.2d at page 487.
"In reviewing the Tax Court's factual determination, the Court of Appeals has made a fair assessment of the record. * * * That being so, this Court will not intervene."