R-W SPECIALTIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
R-W Specialties, Inc. v. Commissioner
Docket No. 9898-78.
United States Tax Court
T.C. Memo 1981-697; 1981 Tax Ct. Memo LEXIS 46; 43 T.C.M. (CCH) 34; T.C.M. (RIA) 81697; December 8, 1981. *46 Held, advances made to petitioner by its shareholders were loans, not contributions to capital, and amounts paid with respect thereto by petitioner to the shareholders are deductible as interest. F. Joseph McGarry and John D. Comer, for the petitioner. Donald T. Rocen, for the respondent. DRENNEN
*47 MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $ 6,061.97, $ 6,906.49 and $ 7,956.28 for the taxable years 1973, 1974 and 1975, respectively. The sole issue for decision is whether for each of the taxable years in issue, petitioner is entitled to an interest deduction under section 163(a) [1] for payments made to its shareholders. [2] Resolution of this issue depends on whether advances made by such shareholders to petitioner created a bona fide debt or were equity contributions. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner R-W Specialties, Inc. (hereinafter petitioner), is a Colorado corporation, *48 whose principal office was located in Denver, Colo., at the time of filing the petition herein. For each of the taxable years in issue, petitioner filed a corporate income tax return with the Internal Revenue Service, Ogden, Utah. Petitioner was organized in January 1965 to engage in the wholesale distribution of specialty building products, primarily selling to lumberyards and contractors. From the date of its incorporation and continuing throughout the taxable years in issue, all of petitioner's capital stock was owned in equal amounts by Ronald W. Pott (hereinafter Pott) and William G. Grimm (hereinafter Grimm). [3] At the time of petitioner's incorporation, the shareholders each contributed $ 8,000 to petitioner and received in return 8,000 shares of stock. The responsibility of operating petitioner was essentially split equally between Pott, its president, and Grimm, its vice president. Although each owned 50 percent, Pott often drew more in salary than Grimm, [4] since his family of eight children required more to live on. *49 Six months after its incorporation, petitioner's warehouse was destroyed by a flood. Thereafter, to rebuild the warehouse, petitioner obtained an SBA disaster loan in the amount of $ 8,000. The loan was guaranteed by both Pott and Grimm, and has since been repaid in full. In 1972, petitioner purchased equipment and inventory of a former supplier located in Tacoma, Wash., that was going out of business. Petitioner hoped to expand its business, and with the equipment and inventory thus acquired, it opened its own operation [5] in Tacoma under the name of Western Turnings. Because petitioner had a growing business, it did not have much cash and consequently had to borrow the funds needed for this purchase. To this end, petitioner obtained a loan of $ 75,000 from the Alameda National Bank (hereinafter the bank), which had been petitioner's bank since its incorporation. The loan was guaranteed by both Pott and Grimm. The interest rate charged on this loan varied, being redetermined every 12 months. The rate charged during 1972 was 7-3/4 percent and rose to between 8-1/2 and 9 percent during 1973. [6]
*50 Petitioner's business has been profitable from the time of its incorporation, and has grown steadily from year to year. Its gross sales have increased substantially, at least since 1968, rising from $ 415,000 in 1968 to $ 2,523,000 in 1975, an increase of over 500 percent. Beginning in January 1972 and continuing through 1975, petitioner had outstanding loans from the bank totaling at any given time between $ 5,000 and $ 75,000. All of these loans were evidenced by written agreements containing repayment schedules for both principal and interest. The loans generally had maturity dates of 30 to 90 days and were secured by petitioner's accounts receivable and inventory. The interest rate charged on these loans ranged between 7-3/4 and 11-1/2 percent. The bank considered $ 75,000 to be about the maximum it would lend petitioner in view of petitioner's "net worth and repayment capacity." In June 1974, the First National Bank of Denver agreed to assist the bank in extending a line of credit to petitioner by agreeing to make available to petitioner a maximum of $ 93,000 at an interest rate of 11-3/4 percent, with each loan made to have a monthly maturity date. [7] Between 1972 *51 and 1975, petitioner considered obtaining loans from a factor, [8] but did not because the interest rate charged on such loans ranged between 12 and 17 percent, and because such an arrangement would require that its customers be notified that their bill was to be paid to the factor. In addition to the loans received from the bank, petitioner received numerous advances from its shareholders beginning in 1966 and continuing throughout the taxable years in issue. The amounts advanced each year depended on how much petitioner needed for working capital and growth purposes as well as on how much the shareholders could afford. The advances made during 1966 and 1967 [9] were paid back to the shareholders in full by the beginning of 1968. However, beginning in 1968, amounts advanced by the shareholders were not paid back in full, but rather *52 were carried forward to succeeding years on the corporate books and records as outstanding shareholder loans. The following figures were entered on the Schedule L of petitioner's income tax returns for the taxable years 1968 through 1975 to reflect the outstanding balance of loans from shareholders as of the beginning and end of each year: Beginning
Ending
Year
balance
balance
1968
$ 30,820.00
1969
$ 30,820.00
54,570.00
1970
54,570.00
77,770.00
1971
77,770.00
114,870.00
1972
114,870.00
157,863.80
1973
157,863.80
179,863.80
1974
179,863.80
212,337.80
1975
212,337.80
212,337.80
All of the shareholder advances were reflected as loans in petitioner's books and records and were reported as outstanding loans on its financial statements as well as on its income tax forms. However, it was not until January 2, 1971, that petitioner signed a note evidencing these advancements. The note required semi-annual payments of interest at 8 percent per year on the balance of loans outstanding to shareholders as of the beginning of each year (as indicated, supra, page 7). The *53 note was unsecured, had no maturity date, and in the space provided for indicating the amount of principal due, were written the words "loan amount." [10] Prior to the creation of this note there existed no formal arrangement for the payment of interest on the shareholder advances. [11]
Of the total advances made by the shareholders, approximately 50 to 52 percent were made by Grimm and 48 to 50 percent by Pott. The following reflects the total outstanding balance of amounts which had been advanced by and were considered owed to Pott and Grimm as of the beginning of each of the taxable years in issue: Amount
Amount
Year
owed Pott
owed Grimm
Total
1973
$ 76,506.90
$ 81,356.90
$ 157,863.80
1974
87,506.90
92,356.90
[12] 179,863.80
1975
101,006.90
111,330.90
212,337.80
*54 At no time either prior to or following the creation of the note was there a fixed schedule for the repayment of principal of the shareholder advances. The following reflects the amount of principal repaid each shareholder from 1968 through 1975: Amount
Amount
Year
paid Pott
paid Grimm
1968
$ 500
$ 2,600
1969
1,000
500
1970
2,900
5,750
1971
5,000
2,500
1972
2,000
2,800
1973
2,000
2,000
1974
1975
Total
13,400
16,150
The funds used to make these principal payments came from the working capital of the business. Petitioner's obligation to pay interest pursuant to the January 1971 note was not subordinate to any other corporate debt. Furthermore, payment of interest pursuant to such note was not conditioned on petitioner's profitability. Neither prior to nor following the creation of the note did petitioner consider converting what it considered to be loans from its shareholders to equity. During the taxable years in issue petitioner did not, at any one time, have sufficient cash to repay the shareholder advances in full. As a small but growing business, most of its cash was needed for working-capital purposes and consequently *55 petitioner was not in a very liquid position. The value of petitioner's assets, [13] however, as indicated on its income tax returns for 1968 through 1975, less all its outstanding liabilities, other than the shareholder advances, exceeded the year ending outstanding balance owed the shareholders for each year. For the taxable years 1973 through 1975, respectively, this so-called "cushion of excess" exceeded the outstanding balance owed the shareholders by at least 75 percent thereof. The value used in computing the "cushion of excess" did not take into account the effect on value that might occur in the event of a forced sale due to liquidation. However, at no time did the shareholders consider liquidating petitioner. In preparation for trial, petitioner had its accountant determine the ratio of debt to equity held by it for each of the taxable years in issue. The accountant calculated the *56 debt side of this ratio by excluding accounts payable from liabilities. The equity portion represented the fair market value of the outstanding stock held by Pott and Grimm, determined by capitalizing earnings to arrive at a value for good will and adding that to capital stock and retained earnings per tax returns. The ratios determined were as follows: 1.2 to 1 for 1973; 1.1 to 1 for 1974; and.8 to 1 for 1975. Respondent determined the ratio of debt to equity held by petitioner during the taxable years in issue as well. [14] However, in so doing, he used the book value of the outstanding stock per returns (after deducting all liabilities including shareholder loans) in determining the equity portion and included accounts payable and shareholder loans in calculating the debt portion. The ratios so determined were as follows: 2.8 to 1 for 1973; 2.6 to 1 for 1974; and 2.2 to 1 for 1975. Petitioner at no time prior to or during the taxable years in issue paid a *57 dividend to either Pott or Grimm. Furthermore, neither of the shareholders made an additional contribution to capital of petitioner after the time of its incorporation. For each of the taxable years 1973, 1974 and 1975, petitioner calculated the amount of interest owed to its shareholders on the advances made by them in the following manner, and deducted this amount for such taxable year: Beginning balance of
outstanding stock-holder
Amount
Year
loans
Interest
[15] deducted 1973
$ 157,863.80
8 percent
$ 12,629.10
1974
179,863.80
8 percent
[16] 14,388.52
1975
212,337.80
8 percent
[16] 16,978.02
Respondent disallowed *58 these deducted amounts in toto. OPINION The sole issue for determination is whether for each of the taxable years in issue, petitioner properly deducted payments made to its shareholders as interest under section 163(a). Resolution of this issue depends on whether advances made by such shareholders to petitioner created a bona fide debt or were equity contributions. Petitioner contends that advances made to it by its shareholders were not contributions to capital, but rather were loans which it was required to repay. Therefore, it argues the shareholder advances created a bona fide debt and that the payments in respect of this indebtedness were properly deducted as interest within the meaning of section 163(a). In support of its position, petitioner asserts that the true intention of its shareholders was that the advances be loans, not contributions to capital, and that such intention was manifested by the fact that the advances were at all times reflected as loans on the corporate books and records, financial statements and income tax returns; that throughout the taxable years in issue it had sufficient assets to pay off such loans in full; that principal and interest *59 payments in respect of such advances were being made; and that it borrowed from its shareholders because of the high rate of interest being charged by outside lenders. Additionally, petitioner maintains that the advances were not made for tax avoidance purposes, but rather for valid business reasons. Respondent correctly maintains that the burden of proof with respect to whether the shareholder advances created a bona fide debt is on petitioner and he asserts that petitioner has failed to meet this burden. In support of his position, respondent asserts that the advances made by the shareholders lacked many of the indicia of a bona fide loan in the following respects: First, advancements were not evidenced by a formal agreement since the promissory note of January 2, 1971, did not state a principal amount due and had no maturity date. Alternatively, even if it did, it is not evidence of the nature of the shareholder advances made prior to 1971, which amounted to approximately 37 percent of the advances outstanding as of December 31, 1975, and thus such note will not support a characterization of the shareholder advances as "loans." Second, he asserts that principal payments were *60 made in an informal manner and were of a sporadic nature. In addition, respondent asserts that: (1) The shareholders made loans in a similar proportion to their equity ownership of petitioner; (2) both shareholders were involved in the management of petitioner; (3) no sinking fund was established for the retirement of these advances; (4) the advances were subordinate to other corporate debts; and (5) petitioner was unable to obtain loans from outside sources. Section 163(a) provides for a deduction of interest paid or accrued within a taxable year on indebtedness. Whether an advance constitutes a bona fide debt is a question of fact, [17] the burden of proof of which is on petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; McSorley's, Inc. v. United States, 323 F.2d 900, 901-902 (10th Cir. 1963); Charter Wire, Inc. v. United States, 309 F.2d 878 (7th Cir. 1962). *61 The ultimate qustion which we must decide in making our determination is whether there was a "genuine intention to create a debt with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship," Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 494 (1980); Republic Supply Co. v. Commissioner, 66 T.C. 446, 458 (1976), affd. in an unpublished opinion,     F.2d     (10th Cir. 1978). See also McSorley's, Inc. v. United States, supra; Byerlite Corporation v. Williams, 286 F.2d 285 (6th Cir. 1960); Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956), affg. 23 T.C. 408 (1954); Rowan v. United States, 219 F.2d 51, 55 (5th Cir. 1955). It is appropriate for us to note that: stockholders of corporations have always been free to commit to corporate operations such capital as they choose and to lend such additional amounts as they may elect to assist in the operation if that is their *62 true intent, always thus reserving the right to share with other creditors a distribution of assets of the enterprise fails. [Rowan v. United States, supra at 55] In this regard, the subjective expressions of intent are not decisive, but "must be weighed against the facts which support contrary inferences." McSorley's, Inc. v. United States, supra; See also Rowan v. United States, supra.
There are numerous factors on which courts have relied in making this determination. [18] These factors have varying degrees of relevancy depending on the particular factual situation and all may not be applicable to any given case. *63 As we have stated, the issue herein is one of fact and all the facts and circumstances should be given consideration. Bowersock Mills & Power Co. v. Commissioner, 172 F.2d 904 (10th Cir. 1949). In light of the evidence received and the record as a whole, we find that it was the genuine intent of petitioner and its shareholders that the advances herein create a debt; that the shareholders could reasonably have expected to be repaid; and that the economic reality of the advances as manifested by the conduct of the parties, supports the creation of a debtor-creditor relationship. Therefore, we hold that a bona fide debt was created by the shareholder advances and that payments in respect of such advances constituted interest within the meaning of section 163(a). In the instant case, petitioner was profitable from its beginning, and grew tremendously and rapidly, as indicated by a 500-percent-plus growth in its sales between 1968 and 1975. Its growth, not lack of profits, resulted in its need for additional cash for working capital. Compare Litton Business Systems, Inc. v. Commissioner, supra.This was the reason for the advancement of funds *64 by the stockholders. The funds were not needed or used to acquire capital assets but were used to meet the everyday cash needs of the business. It was expected that the advances would be repaid in a reasonable time but a definite timetable could not realistically be fixed, unless the funds were to be repaid and then advanced again. Thus, the advances were originally evidenced on the corporate books as an open running account, loans from shareholders, rather than by notes with a fixed due date. Compare Rowan v. United States, supra.While petitioner apparently at no time through the years here involved had sufficient cash to repay all of the advances in a lump sum, from 1968 and continuing throughout the taxable years in issue, the value of petitioner's assets was more than sufficient to repay its other liabilities and the outstanding shareholder advances in full. In short, there was no indication that petitioner either would not or could not repay the shareholder advances. Petitioner had paid in full an SBA loan it received in 1965, had paid in full the shareholder advances received during 1966 and 1967, and had made principal payments on the outstanding *65 shareholder advances prior to and including the taxable year 1973, as well as interest payments on such advances for at least the taxable years 1971 through 1975. Pott and Grimm were in control of petitioner and could have withdrawn their advances, or at least most of them, at any time petitioner's financial position permitted. In light of petitioner's profitability from its inception and the availbility of borrowed funds to meet its cash needs, petitioner had no need for additional capital (see discussion of the debt-equity ratio following) and it would be unrealistic to think that Pott and Grimm would pour additional capital into it under the circumstances. It has been said that-- the essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chance of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. [United States v. Title Guarantee & Trust Co., 133 F.2d 990, 993 (6th Cir. 1943).] Pott *66 and Grimm, as shareholders, were in a position to make a profit without contributing more capital to petitioner. But in view of petitioner's history of profitability, its high rate of growth, its history of repaying its debts, and its excess of assets over liabilities, [19] we believe there was every expectation and intention on the part of petitioner and the shareholders that these advances would be repaid, with interest thereon, and that they were not being put at the risk of the business any more so than any other unsecured loan to a business venture. Cf. McSorley's, Inc. v. United States, supra.The lenders expected to be paid, [20] they had been paid, and had no reason to believe they would not continue to be paid. In addition to the above, other factors support our conclusion. The ratio of debt to *67 equity held by petitioner during the taxable years in issue was more than reasonable regardless of whether it is determined by the method employed by petitioner [21] or by respondent. The debt-to-equity ratio did not exceed 2.8-to-1 using respondent's method and 1.2-to-1 using petitioners. Neither of these is excessive. Compare Tomlinson v. 1661 Corporation, 377 F.2d 291, 300 (5th Cir. 1967), where the ratio was 14.6-to-1. There is no indication that the advances were made in the form of loans rather than contributions to capital in order to avoid or evade taxes. See Byerlite Corporation v. Williams, supra at 292. There was a business purpose for the loans; cash was needed and could be borrowed at a lower rate of interest and on less strigent terms from the shareholders than from the banks. The advances were in small amounts when the business was young and they were reflected on petitioner's books and treated as loans from the beginning. It is true that they were not evidenced by a note with a definite repayment schedule at first, but a note a was executed by petitioner in 1971. The note reflected the nature of the understanding of the parties; the amount *68 was "Loan Amount," indicating that funds were advanced and repaid as conditions dictated, with an accounting every 6 months. Interest was fixed at 8 percent per year, payable every 6 months, which was a reasonable rate of interest. We realize that some of the factors relied on by respondent and in other cases, as applied to the facts in this case, do not support our conclusion, but none of them are conclusive in this case. In few cases, if any, would all of the factors that might be taken into consideration favor one result or the other. The lack of a formal agreement evidencing a loan is a factor to take into consideration, but is seldom determinative of the issue, particularly in a closely held corporate setup such as we have here. [22]Rowan v. United States, supra.As mentioned above petitioner did execute a note in 1971, but *69 respondent argues that a large part of the advances that were unpaid during the years in issue were made prior to 1971. We cannot give much weight to this argument under the circumstances, but even if we do the characterization of a transaction as it was initially created is not determinative of the characterization for the taxable years in issue. [23] Indeed what was originally debt may become capital, and the reverse is also true. See Tampa & Gulf Coast Railroad Co. v. Commissioner, 56 T.C. 1393, 1402 (1971); Cuyuna Realty Company v. United States, 180 Ct. cl. 879, 382 F.2d 298, 301 (1967). We have already mentioned that the fact that there was not a fixed amount due, because the advances were made on an open running account, the balance of which was constantly changing, and the fact that there was no maturity date *70 for the repayment of the principal, do not require a conclusion that the advances herein were contributions to capital. That principal payments were in fact being made by petitioner, albeit absent a repayment schedule, is supportive of petitioner's claim that the advances were loans. Byerlite Corporation v. Williams, supra.
The fact that the shareholders who made the advances participated in the management of petitioner is of little value in determining whether the advances were capital contributions where a small closely held corporation is involved. The stockholders of such corporations are nearly always involved in management, and to determine on that basis that the advances were capital contributions would effectively forestall a stockholder of such corporation from making any loan or advances thereto. See J.S. Biritz Construction Co. v. Commissioner, 387 F.2d 451 (8th Cir. 1967), revg. a Memorandum Opinion of this Court. A strong inference arises that purported loans in actuality constitute capital investments if stockholders of a corporation make such loans in direct proportion to their equity ownership of the corporation. Charter Wire, Inc. v. United States, supra at 880; *71 Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. 451 (1969). This is especially true in the context of a closely held corporation such as petitioner, where the equity ownership is held equally by two unrelated shareholders. Here, such proportionality does not exist. Throughout the taxable years in issue, Pott accounted for approximately 48 percent of the shareholder advances, while Grimm accounted for 52 percent. Were these advances to be characterized as capital contributions, Grimm's large advances might lay a foundation for him to claim an increased voice in the conduct of the business of petitioner. This was clearly not the intention of such shareholders, as evidenced by the fact that each held 8,000 shares of stock, the responsibility of managing petitioner was split equally, and the salary paid to each was essentially the same, except that Pott would at times take a slightly greater amount due to his family needs. [24]
*72 The fact that no sinking fund or other arrangement had been established to pay off the advances is another fact that has been given consideration. The absence of such an arrangement where there was doubt as to the recipients capacity to repay the advances without invasion of its capital has been said to indicate that no real debtor-creditor relationship existed. See National Farmers Union Service Corp. v. United States, 400 F.2d 483 (10th Cir. 1968). But here, in view of the petitioner's history of profitability and paying its debts, the nonexistence of such a fund loses most of its significance. Respondent has made two additional assertions in support of his position, which we decline to accept. First, he argued that repayment of the advances herein was subordinated to other corporate debts because loans received from the bank were secured. We decline to give such assertion much weight. Of course a bank will always demand security for its loans. But there is no evidence that these advances were subrogated to petitioner's general creditors. As unsecured creditors of petitioner, both shareholders would be entitled to share with other general creditors of *73 petitioner in the distribution of its asserts in satisfaction of their respective claims in the unlikely event of petitioner's failure. [25] See Litton Business Systems, Inc. v. Commissioner, supra at 378. Second, he argued that petitioner was unable to obtain outside financing during the taxable years in issue and that such inability supports his characterization of the advances herein. See National Farmers Union Service Corp. v. United States, supra; cf. Charter Wire, Inc. v. United States, supra. The facts, however, indicate otherwise. Between January 1972 and December 1975, petitioner obtained loans from the bank totaling between $ 5,000 and $ 75,000 at any one time. Although this was about the maximum amount the bank was willing to lend petitioner, the First National Bank of Denver was willing to provide a *74 line of credit to petitioner of up to $ 93,000 at a rate of interest of 11-3/4 percent. That petitioner chose not to borrow from an outside source does not necessarily indicate it could not have done so had it so desired. The "[i]nability to obtain outside financing is not same as, and cannot be quated with, the ability to obtain outside financing but at a cost which to the businessman is economically unwise." Tomlinson v. 1661 Corporation, supra at 300. Moreover, it has long been held that stockholders of a corporation are free to determine how much of their funds they care to risk in the form of capital and how much they are willing to lend as credit. See John Kelley Co. v. Commissioner, 1 T.C. 457 (1943), affd. 326 U.S. 521 (1946). The fact that loans allow the corporation to take deductions while capital contributions do not, does not empower the "Commissioner of Internal Revenue to rewrite [its] balance sheet * * * and show to be capital what was intended to be a loan." Byerlite Corporation v. Williams, supra at 290; Rowan v. United States, supra at 54. In view of the evidence presented *75 and the record as a whole, we find that the shareholder advances to petitioner created a bona fide debt. [26] We have not relied on any single overriding factor in making our determination, as it is our belief that the whole of this case is more reflective of the true relationship created by the advances than the individual parts. The advances created a genuine debt with reasonable expectations for repayment, and the intention of the parties comports "with the economic reality of creating a debtor-creditor relationship." Litton Business Systems, Inc. v. Commissioner, supra at 377. Therefore, we hold that payments by petitioner with respect to these advances were properly deducted as interest pursuant to section 163(a). *76 Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. ↩
2. Certain other adjustments to petitioner's taxable income for the taxable years 1974 and 1975 were made by respondent in his notice of deficiency. None of these adjustments are at issue herein.↩
3. Pott and Grimm are sometimes herein referred to collectively as the shareholders. ↩
4. For the taxable years 1968-1975, but excluding 1971 for which no evidence was presented, the corporate income tax returns filed by petitioner indicated that Pott and Grimm received salary payments as follows: ↩
Year
Pott
Grimm
1968
$ 29,504
$ 27,600
1969
32,500
30,700
1970
37,700
36,300
1972
58,195
56,420
1973
50,635
50,035
1974
47,000
47,000
1975
52,000
52,000
5. The exact nature of petitioner's Tacoma, Wash., business was not disclosed. ↩
6. This loan had a maturity date of 3 years from the date made. No evidence was presented as to the rate of interest charged for years subsequent to 1973.↩
7. At no time prior to or during the taxable years in issue did petitioner borrow any amount from the First National Bank of Denver. ↩
8. A factor is "a commercial banker or finance company specializing in financial services to producers and dealers (as discounting of accounts receivable)." Webster's Third New International Dictionary (1971).↩
9. A total of $ 2,000 was paid back to the shareholders in 1967.↩
10. These words indicated that the total amount advanced and outstanding, whatever that may be, was owed by petitioner. ↩
11. No evidence was presented as to the amount, if any, of interest paid by petitioner with respect to such advances prior to 1971. For 1972 the total interest paid the shareholders was $ 5,118.48.↩
12. Each shareholder advanced petitioner $ 13,000 during 1973 and each received a repayment of principal in the amount of $ 2,000, resulting in a net total increase of outstanding shareholder advances of $ 22,000.↩
13. The value indicated on the respective income tax returns was book value. Assets included, inter alia↩, accounts receivable, inventory, and machinery. The land and building wherein petitioner was located was owned by R-W Investment Co., a partnership owned by Pott and Grimm.
14. Respondent also determined a debt-equity ratio for 1968 through 1972. The ratios determined were as follows: 4.7 to 1 for 1968; 3.6 to 1 for 1969; 4.4 to 1 for 1970; 4.2 to 1 for 1971; and 3.6 to 1 for 1972.↩
15. For 1974 and 1975, all amounts of interest deducted were paid to the shareholders, and included by them in their gross income for such years. However, Grimm stated that for the taxable year 1973, petitioner paid him $ 6,412.56 and paid Pott $ 6,024.24 as interest on their respective advances to petitioner, totaling only $ 12,436.80. The discrepancy was not explained. ↩
16. These are the figures as stipulated to by the parties. However, the correct amount for these years is $ 14,389.10 for 1974 and $ 16,987.02 for 1975.↩
17. This so-called debt versus equity issue has resulted in a multitude of decisions, none of which are controlling in the instant case. As was stated in Tyler v. Tomlinson, 414 F.2d 844, 847 (5th Cir. 1969): While some legal problems are endowed with a case by case uniqueness calling for adhoc determinations, the debt-equity problem has exhibited a special kind of unequity. The oft-cited principle that each case "must be judged on its own unique fact situation," [citations omitted] has resulted in a lack of decisional uniformity even in cases where the individual creditor-debtor relationships exhibit ostensible similitude. Whether this situation will be cured or ameliorated by the regulations under sec. 385, added by the Tax Reform Act of 1969 (Pub. L. 91-172, sec. 415(a), 83 Stat. 487, 614) remains to be seen. These regulations are inapplicable to this case as they apply to transactions entered into after Dec. 31, 1981.↩
18. These factors include, interalia: (1) The names given to the certificates (if any) evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of payments; (4) the right to enforce the payment of principal and interest; (5) participation in management by the lenders; (6) whether the advance has a status equal to or inferior to that of other corporate debts; (7) the intent of the parties; (8) the ratio of debt to equity; (9) the identity of interest between creditor and stockholders; (10) the payment of interest out of dividend money; and (11) the ability of the corporation to obtain loans from outside lending institutions. Montclair, Inc. v. Commissioner, 318 F.2d 38 (5th Cir. 1963), affg. a Memorandum Opinion of this Court. This list is by no means exclusive and additional factors have been considered in decisions involving this issue. See Fin Hay Realy Co. v. United States, 398 F.2d 694↩ (3d Cir. 1968).
19. See Deseret News Publishing Co. v. Commissioner, T.C. Memo. 1975-156↩. 20. Principal payments were made in every year in which an outstanding balance of shareholder advances existed, except for 1974-1975, and although no principal payments were made during such years, interest payments were made in the total amount of $ 31,376.12.↩
21. The use of the fair market value of stock, rather than book value is an acceptable method for determining the equity portion of this ratio. See Green Bay Structural Steel, Inc. v. Commissioner, 53 T.C. 451, 456 (1969); Christie Coal & Coke Co., Inc. v. Commissioner, T.C. Memo. 1969-92↩.
22. See Charlie Sturgill Motor Co. v. Commissioner, T.C. Memo. 1973-281; Joseph Lupowitz Sons, Inc. v. Commissioner, T.C. Memo. 1972-238; Christie Coal & Coke Co., Inc. v. Commissioner, supra↩.
23. See Joseph Lupowitz Sons, Inc. v. Commissioner, supra↩.
24. It is noteworthy that Grimm had accounted for more of the shareholder advances than Pott, which belies an argument that Pott received more in salary because, as a result of such advances, he owned more of petitioner.↩
25. We find little significance in the fact that when valuing its asserts, petitioner did not consider a liquidation value. There was no indication that petitioner considered liquidating at any time during the taxable years here in issue, and no indication that it would not continue to be profitable.↩
26. While we have concluded from the evidence presented that the advances made by petitioner's two shareholders through the years here in issue were bona fide loans, and the payments with respect thereto are deductible as interest, we wish to point out that, as noted in the body of this opinion, what was originally debt may become capital. Tampa & Gulf Coast Railroad Co. v. Commissioner, 56 T.C. 1393, 1402 (1971), affd. per curiam 469 F.2d 263 (5th Cir. 1972); Cuyuna Realty Company v. United States, 180 Ct. Cl. 879, 382 F.2d 298↩ (1967). It is understandable that in a growing business the shareholders would be willing to advance funds in the form of loans to provide working capital to the corporation in its infancy. But the longer those advances are left with the corporation, the more the advances serve the function of capital and may be treated as such for tax purposes.