ELBERT D. AND MAE M. SWAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swain v. Commissioner
Docket No. 2157-78.
United States Tax Court
T.C. Memo 1981-716; 1981 Tax Ct. Memo LEXIS 35; 43 T.C.M. (CCH) 121; T.C.M. (RIA) 81716; December 17, 1981. *35 Held, transfers of funds between sibling corporations constituted bona fide loans and thus no constructive dividend resulted to common controlling shareholder. Held further, $ 100,000 transfer to controlling shareholder constituted the repayment of indebtedness and not a dividend. John Q. Beard and Barbara Mills Larkin, for the petitioners. Frank D. Armstrong, Jr., for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1972
$ 44,209.09
1973
108,232.02
Concessions *36 having been made by both parties, the only question remaining for our consideration is whether transfers of funds from certain corporations controlled by petitioners to other corporations similarly controlled constitute constructive dividends to petitioners under sections 301 and 316. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference… Petitioners, Elbert D. and Mae M. Swain, husband and wife, timely filed their 1972 and 1973 joint Federal income tax returns with the Internal Revenue Service Center in Memphis, Tennessee. Petitioners' [2] residence at all times relevant hereto was in Raleigh, North Carolina. During 1972, petitioner was the majority shareholder in each of the following six corporations: 1. R & S Distributing *37 Co., Inc., a North Carolina corporation (R & S); 2. R & S Packing Co., Inc., a North Carolina corporation (Packing); 3. Swain's Charcoal Steak House, Inc., a South Carolina corporation (Cayce); 4. Charcoal Steak House of Charlotte, Inc., a North Carolina corporation (Charlotte); 5. Charcoal Steak House of Greensboro, Inc., a North Carolina corporation (Greensboro); and 6. Swain's Charcoal Steak House, Inc., a Florida corporation (Jacksonville). During 1972, petitioner was also a stockholder in Swain's Charcoal Steak House of Atlanta, Inc., a Georgia corporation (Atlanta). As of the end of the calendar year 1972, the outstanding capital stock of Atlanta was held as follows: Number of
Shareholder
Shares Held
Elbert D. Swain
1,552
Mae M. Swain
600
W. A. Swain (petitioner's son)
1,248
L. A. Hunter, Jr. (Nominee)
2
3,402
At all times relevant hereto, restaurant operations were either condudcted by or on business premises controlled by Packing (in Raleigh, North Carolina), Cayce (in Cayce, South Carolina), Charlotte (in Charlotte, North Carolina), Greensboro (in Greensboro, North Carolina), Jacksonville (in Jacksonville, Florida), and Atlanta *38 (in Atlanta, Georgia), all under the name Swain's Charcoal Steak House. [3]
Effective January 1, 1973, Packing, Cayce, Charlotte, Greensboro, Jacksonville, and Atlanta became wholly owned subsidiaries of R & S pursuant to a plan of reorganization. The acquisition of the subsidiaries by R & S had been contemplated for some time *39 prior to January 1, 1973, but was deferred pending the buyout of a substantial minority shareholder of R & S, Cayce, Charlotte, and Greensboro. Upon consummation of the reorganization, the outstanding capital stock of R & S was held as follows: Number of
Shareholder
Shares Held
Percentage
Elbert D. Swain
1,014
61.42
Mae M. Swain
389
23.56
W. E. Swain
156
9.45
Judith S. Keener
21
1.27
Annie M. Swain
21
1.27
Linda C. Swain
21
1.27
Eugene R. Keener [4]
29
1.76
1,651
100.00
In early 1970, petitioner began negotiating with the owners of a combination motel and restaurant located in Norfolk, Virginia, regarding acquisition of the property. The motel and restaurant were both owned and operated by Fifth J.M.J. Corporation, a Virginia corporation (Fifth J.M.J.). Fifth J.M.J. had been operating at a loss for several years as follows: Year Ending
Loss
June 30, 1970
$ 1,045.21
June 30, 1969
55,004.31
June 30, 1968
86,982.21
June 30, 1967
49,732.78
Petitioner studied the financial *40 records of the business and observed its operations and management. Petitioner noted that Fifth J.M.J. had valuable assets such as an excellent waterfront location easily accessible from major highways, a marina, a 99-year lease on its business premises requiring rent payments of only $ 10,000 per year, and a first-class restaurant facility. Despite Fifth J.M.J.'s history of losses, petitioner believed that if the motel and restaurant were properly managed they could be turned into profitable operations. The owners of Fifth J.M.J. had invested heavily in the business and had lost a considerable amount of money. As a result, they were willing to sell their stock at a low price. Pursuant to a stock purchase agreement dated July 30, 1970, petitioner purchased all of the outstanding capital stock (120 shares) of Fifth J.M.J. Simultaneously with the purchase of this stock and pursuant to prior agreement, petitioner assigned 10 percent of the stock (12 shares) to J. D. Castleberry (Castleberry) in partial consideration of the latter's assumption of 10 percent of the obligations imposed upon petitioner under the agreement. [5]
*41 Petitioner acquired the outstanding stock of Fifth J.M.J. by the payment of $ 25,000 in cash and the pledge of the stock as collateral to guarantee payment of certain promissory notes issued by Fifth J.M.J. to its former stockholders totalling $ 175,000. The agreement also provided that petitioner would invest up to $ 150,000 in Fifth J.M.J. in order to pay its normal operating expenses and fixed debt obligations. The agreement further provided that petitioner at any time after he personally invested $ 150,000 in the business, could surrender the stock certificates of Fifth J.M.J. to the sellers and be relieved of all further liability under the agreement. The former stockholders of Fifth J.M.J. remained personally liable on two real estate mortgages on property owned by the corporation. The principal balance owing on the mortgages as of July 30, 1970, was $ 842,916.60. Petitioner assumed no personal or contingent liability on these mortgages. In order to cut expenses and hopefully reverse the losses that Fifth J.M.J. had incurred, petitioner caused several changes to be made including the installation of a laundry system and a change to a less expensive motel franchise. The *42 operations, however, were beset by a series of unforeseen adverse events which thwarted petitioner's efforts to promptly turn Fifth J.M.J. into a profitable business. The beaches in the area were closed because the water adjacent to the motel and restaurant was found to be polluted by sewage and the chemical kepone. The major highway providing access to the premises was closed due to the construction of a bridge tunnel. Additionally, travel and tourism were severely curtailed by the energy shortage. Consequently, Fifth J.M.J. continued to sustain operating losses until 1977. Fifth J.M.J.'s reported income and loss figures and depreciation deductions for the taxable years ending June 30, 1971 through June 31, 1978, were as follows: Taxable Year
Income
Depreciation
Ended
(Loss)
Deduction
June 30, 1971
($ 14,110.00)
$ 81,067.00
June 30, 1972
( 52,929.00)
80,137.00
June 30, 1973
( 70,204.00)
78,652.04
June 30, 1974
( 53,755.00)
59,704.43
June 30, 1975
( 35,714.00)
60,443.00
June 30, 1976
( 13,565.53)
66,699.76
June 30, 1977
11,213.00 68,571.20
June 30, 1978
83,385.00 62,640.59
Pursuant to the requirement of the stock purchase agreement *43 to invest up to $ 150,000 in Fifth J.M.J., petitioner and Castleberry had invested a total of $ 143,479.92 by December 31, 1972, as follows: Personal
Bank
Accounts
Loans to
of Swain &
Swain from
Cumulative
Castleberry
Companies
Total
July 70 Capital Stock
Purchased
25,000.00
25,000.00
Aug. 70 Swain Personal
A/C at First VA
2,454.70
27,454.70
Aug. 70 Swain Personal
A/C at First VA
9,000.40
36,455.10
Oct. 70 Swain Personal
A/C at First VA
8,388.82
44,843.92
Feb. 71 Swain Personal
A/C at First VA
15,000.00
59,843.92
Mar. 71 Swain Personal
A/C at First VA
2,500.00
62,343.92
2,500.00
64,843.92
Apr. 71 Swain Personal
A/C at First VA
2,000.00
66,843.92
May 71 Swain Personal
A/C at First VA
14,000.00
80,843.92
Dec. 71 From R & S
5,000.00
85,843.92
Mar. 72 From Cayce
18,000.00
103,843.92
Mar. 72 Castleberry
Personal A/C
2,300.00
106,143.92
Mar. 72 Castleberry
Personal A/C
2,200.00
108,343.92
June 72 From Cayce
27,000.00
135,343.92
June 72 Castleberry
Personal A/C
3,000.00
138,343.92
June 72 Expenses
Advanced by
Shareholders
4,136.00
142,479.92
Dec. 72 Castleberry
Personal A/C
1,000.00
143,479.92
Balances
93,479.92
50,000.00
143,479.92
*44 On October 16, 1972, petitioner notified the prior stockholders that pursuant to the stock purchase agreement he intended to exercise his option to surrender the stock certificates and thereby be relieved from any further liabilities of Fifth J.M.J. The prior stockholders of Fifth J.M.J. did not want to accept the stock certificates, and a modified agreement dated June 15, 1973, was ultimately negotiated. In the new agreement, petitioner and Castleberry agreed to retain their stock interest and personally assume the liability for the corporate real estate mortgages in partial consideration for the agreement to cancel $ 150,000 of Fifth J.M.J.'s promissory notes payable to two of the former stockholders. During the period of negotiations, the investment of petitioner and Castleberry in Fifth J.M.J. continued as follows: Personal
Bank
Account
Loans to
of Swain &
Swain from
Cumulative
Castleberry
Companies
Total
Feb. 73 Castleberry
Personal A/C
1,200.00 144,679.92
Feb. 73 Castleberry
Personal A/C
1,000.00 145,679.92
Apr. 73 Castleberry
Personal A/C
1,500.00 147,179.92
June 73 *
3,000.00 150,179.92
June 73 **
70,873.70 221,053.62
Reclassified as
Payable
(4,136.00)
216,917.62
Totals
166,917.62 50,000.00
Loans - Swain
174,633.23 Loans - Castleberry
17,284.39 Capital Stock
25,000.00 216,917.62 *45 During 1972 and 1973, R & S and the subsidiaries advanced funds totalling $ 162,800.00 to Fifth J.M.J. in order to enable the corporation to meet its operating expenses, acquire new capital assets and service fixed debt obligations. The funds received by Fifth J.M.J. from those sources are as follows: Date of
Transfer
Transferor
Amount
2/72
R & S
$ 22,500.00
3/72
Cayce
18,000.00
6/72
Cayce
30,000.00
12/72
Greensboro
9,000.00
Total
$ 79,500.00
1/10/73
Packing
10,000.00
2/1/73
Packing
800.00
2/11/73
Charlotte
9,000.00
3/23/73
R & S
13,500.00
5/18/73
R & S
40,000.00
8/9/73
R & S
10,000.00
Total
$ 83,300.00
In addition, on or about the dates specified, the following transactions occurred. On March 9, 1973, Packing advanced the sum of $ 100,000 to its parent corporation, R & S. [6] On March 12, 1973, R & S advanced the sum of $ 100,000 to Atlanta, its wholly owned subsidiary, and on March 23, 1973, Atlanta paid the sum of $ 100,000 *46 to petitioner as partial repayment of certain advances petitioner previously had made to Atlanta. [7] Petitioner subsequently used the $ 100,000 repaid to him to meet the operating needs and to service fixed debt obligations of Fifth J.M.J. On June 27, 1973, petitioner used $ 70,873.70 of that amount to retire Fifth J.M.J.'s mortgage with the Southern Bank of Norfolk. Atlanta's assets on May 31, 1972, the end of its 1972 fiscal year, had a book value of $ 475,181.57 and its liabilities on that date totaled $ 397,891.05 leaving a book net worth of $ 77,290.52. Atlanta's assets on May 31, 1973 had a book value of $ 379,551.81 and its liabilities on that totaled $ 308,384.10, leaving a book net worth of $ 71,167.71. Atlanta was consistently able to meet its operating expenses without having to borrow funds. The fair market value of the real estate owned by Atlanta was substantially greater than its book value. Petitioner systematically developed the Swain restaurant *47 chain over the period of time from the 1950's to the date of trial. During these years, petitioner, R & S, and the subsidiaries have advanced sums to the various corporations within the corporate group for use in the business conducted by each and as a means of assuring the economic viability of all members of this group. Neither petitioner nor the corporations have ever charged interest on these loans. None of the restaurants in the group have ever failed although some have operated at a loss both during and after their development or acquisition. The advances made to Fifth J.M.J. were consistently recorded on its books as notes payable and on the transferor's books as loans. The June 30, 1973 year-end balance sheet of Fifth J.M.J. listed the advances as liabilities (loans from shareholders). The advances were noted on the balance sheets of the transferor corporations as assets. On June 30, 1974, R & S, the subsidiaries, and petitioner reconsolidated all debt existing among them. After the reconsolidation the only debtor-creditor relationships that appeared on the books of the various entities were between R & S and the others. As of June 30, 1974, the intercompany balances *48 between R & S, its subsidiaries, and Fifth J.M.J. were as follows: Cayce
$ 12,000.00 Packing
112,578.03 Jacksonville
(31,146.10)
Charlotte
106,500.00 Greensboro
86,000.00 Atlanta
(186,212.85)
Fifth J.M.J.
(152,800.00)
Net Payable
(Receivable)
[8] $ (53,080.92)
In 1974, the directors and shareholders of Fifth J.M.J. adopted a resolution acknowledging Fifth J.M.J.'s indebtedness to R & S, Castleberry and petitioner in the amounts of $ 152,800, $ 17,284.39, and $ 174,633.23, [9] respectively, and a resolution directing the officers to execute promissory notes for those amounts on behalf of the corporation. Nonnegotiable promissory notes of Fifth J.M.J. were prepared by the corporation's attorney. The notes, dated July 1, 1974, bear interest at the rate of 6 percent per annum and have a maturity date of July 1, 1979. They contain an unconditional promise to pay and right to enforce payment. These notes were executed by Castleberry as president of Fifth J.M.J. and issued to R & S, Castleberry, and petitioner. No Interest has ever been *49 paid on these notes. Effective July 1, 1974, petitioner contributed all of his Fifth J.M.J. stock to the capital of R & S without receiving any consideration for the transfer. Effective November 15, 1974, Fifth J.M.J. issued 120 shares of its $ 1,000 par common stock to R & S. Fifth J.M.J. intended this stock to constitute partial repayment of the promissory note given to R & S. After the issuance of the stock R & S owned 95 percent (228 of 240 shares) of the total outstanding stock of Fifth J.M.J. [10]
At all times relevant hereto, R & S was engaged in the business of providing for profit managerial services for each of the other corporations including Fifth J.M.J. These services included operational supervision, accounting and bookkeeping services, payment of business expenses, collection of receivables, maintenance of financial controls and payroll records, including payment of wages and salaries to the corporations' employees, and the preparation and filing of all sales, income, withholding, and employee tax returns as *50 well as payment of the taxes reflected as owing thereon. R & S's existence and profitable operation are directly dependent upon the continued operation of the other corporations. During its taxable years listed below, R & S received administrative and managerial fees from Fifth J.M.J. as follows: Taxable Year Ended
Motel
Restaurant
Total
June 30, 1971
$ 1,200.00
$ 1,200.00
June 30, 1972
2,400.00
2,400.00
June 30, 1973
2,400.00
2,400.00
June 30, 1974
$ 2,200.00
3,400.00
5,600.00
June 30, 1975
5,200.00
5,850.00
11,050.00
June 30, 1976
5,200.00
5,850.00
11,050.00
In addition, R & S purchased and sold food supplies for profit to each of the subsidiaries and Fifth J.M.J. During its taxable years listed below, R & S made sales to its subsidiaries and Fifth J.M.J. as follows: December 31,
December 31,
December 31,
Subsidiary
1970
1971
1972
Charlotte
$ 128,121.64
$ 147,688.67
$ 148,966.38
Greensboro
117,013.11
162,157.59
163,260.32
Packing
110,839.26
151,819.41
150,887.41
Jacksonville
104,076.77
125,392.91
149,638.00
Fifth J.M.J.
(Restaurant)
18,779.65
56,696.44
37,786.16
Atlanta
36,998.54
33,602.44
27,414.31
Cayce
135,903.40
147,516.73
141,495.33
Fifth J.M.J.
(Motel)
Totals
$ 651,732.37
$ 824,874.19
$ 819,447.91
*51 June 30, 1973
June 30,
June 30,
Subsidiary
(6 months)
1974
1975
Charlotte
$ 70,127.24
$ 133,180.72
$ 104,399.45
Greensboro
72,524.01
136,630.74
110,547.20
Packing
69,795.09
127,332.53
134,567.59
Jacksonville
82,355.97
172,364.32
130,003.86
Fifth J.M.J.
(Restaurant)
11,708.92
43,948.19
43,948.19
Atlanta
16,665.19
42,638.62
51,933.77
Cayce
63,986.74
129,308.98
118,735.75
Fifth J.M.J.
(Motel)
Totals
$ 387,163.16
$ 785,404.10
* $ 692,818.34
June 30,
June 30,
June 30,
Subsidiary
1976
1977
1978
Charlotte
$ 112,971.46
$ 177,672.28
Greensboro
136,154.93
142,850.23
137,558.00
Packing
172,818.22
173,538.43
226,426.00
Jacksonville
124,561.20
80,604.54
71,261.00
Fifth J.M.J.
(Restaurant
42,709.33
41,966.69
42,659.00
Atlanta
56,855.64
44,383.14
35,395.00
Cayce
115,352.92
114,030.41
126,045.00
Fifth J.M.J.
(Motel)
685.15
733,34
1,187.00
Totals
$ 762,108.85
** $ 775,819.06
$ 640,531.00
*52 Fifth J.M.J. always paid the fees for products and services purchased from R & S on a weekly basis. R & S benefited from the inclusion of new subsidiaries and the resulting sales of goods and services to these subsidiaries. Each of the subsidiaries and Fifth J.M.J. had a significant business interest in the continued operation of the others. All of the subsidiaries and Fifth J.M.J. operated their restaurants under the same name and each restarant advertised the locations of the other restaurants. In addition, a common credit card which permitted the holder to charge meals at any restaurant in the chain was issued to qualified patrons. Each restaurant endeavored to maintain uniform quality to insure to the chain's customers predictably high standards of service, food and atmosphere in order to encourage increased patronage at its own establishment and at the other locations. Respondent determined that the transfers of funds from the subsidiaries and R & S to Fifth J.M.J. and the series of transfers that resulted in the payment of $ 100,000 by Atlanta to petitioner constituted constructive dividends to petitioner. On December 5, 1977, respondent issued a notice of deficiency *53 determining that petitioner received additional income of $ 79,400 [11] in 1972 and $ 183,200 in 1973 from the constructive receipt of dividends from the corporations. [12]
OPINION The sole question presented for our determination is whether petitioner received constructive dividends in the amounts of $ 63,331.78 in 1972 and $ 183,300 in 1973 resulting from intercorporate transfers of funds during those years.
Section 301 provides that a distribution of property made by a corporation to a shareholder with respect to its stock shall *54 be included, to the extent that it is a dividend, in the gross income of the shareholder. Section 316 defines the term "dividend" as any distribution of property made by a corporation to its shareholders out of its accumulated earnings and profits or out of its earnings and profits of the current taxable year. It is respondent's contention that the intercorporate advances made to Fifth J.M.J. and the $ 100,000 transfer made in March 1973, were distributions for the benefit of petitioner and, as such, constitute constructive dividends to him.
Where funds are transferred from one sibling corporation to another, the constructive dividend theory is that the funds pass from the transferor corporation to the common stockholder as a dividend and then to the transferee corporation as a capital contribution. Sammons v. Commissioner, 472 F.2d 449, 453 (5th Cir. 1972), affg. in part and revg. in part and remanding a Memorandum Opinion of this Court. However, a transfer of funds between *55 two corporations will not result in a constructive dividend to shareholders merely because the transferor and transferee corporations are commonly owned. Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862, 868 (3rd Cir. 1974), affg. on this issue a Memorandum Opinion of this Court. There is no constructive dividend where the transfer represents a bona fide loan or if the shareholders receive only an indirect or derivative benefit from the transfer. Gilbert v. Commissioner, 74 T.C. 60, 64 (1980). However, it is a well-established rule that transfers between related corporations that do not constitute bona fide loans can result in constructive dividends to a common shareholder if the transfers were made primarily for his benefit and if he received a direct or tangible benefit therefrom even if the funds do not pass though his hands. Gilbert v. Commissioner, supra; Schwartz v. Commissioner, 69 T.C. 877, 884 (1978); Rapid Electric Co. v. Commissioner, 61 T.C. 232, 239 (1973). TRANSFERS TO FIFTH J.M.J. It is petitioner's position that respondent's characterization of the intercorporate *56 transfers to Fifth J.M.J. as constructive dividends is in error because the transfers constituted bona fide loans. The existence of a bona fide loan is an issue of fact and its resolution turns upon the circumstances of the particular case. See Gilbert v. Commissioner, supra.The deficiency determinations of the respondent are presumed to be correct and the petitioner has the burden of proving them incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973), the Court reviewed the case law on the issue of the existence of bona fide debt between related corporations and concluded that no single element was determinative but rather the question required an analysis of various factors. We stated: the determinative question, to *57 which an evaluation of the various independent factors should ultimately point, is as follows: Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship? No mechanically precise test has been formulated to determine the existence of the requisite intention. Rather, the answer depends upon the weighing of factual criteria such as the existence of a reasonable expectation of repayment and the economic reality of the claimed debtor-creditor relationship. Gilbert v. Commissioner, supra at 65. Petitioner argues that the stipulated facts and the testimony at trial demonstrate that the intercorporate transfers at issue were made with the bona fide intention to create a debt. We agree with petitioner for the following reasons: First, the Swain restaurant chain, since its inception in the 1950's, has had a history of making intercorporate advances to the various member restaurants. See Joseph Lupowitz Sons, Inc. v. Commissioner, supra at 868. Historically, the purpose of these advances has been to assist newer *58 restaurants to begin operations [13] and subsequently to assure the economic viability of all members of the corporate group. [14] These advances were all noninterest bearing loans and, with the exception of certain loans made in Atlanta, all have been repaid. Petitioner's development of Fifth J.M.J. closely parallels his dealings *59 with the other restaurants in all relevant aspects. Although petitioner purchased Fifth J.M.J. as an ongoing enterprise [15] rather than initiating its operations (as had been the case with the other restaurants), his experience in the restaurant business convinced him that the purchase of Fifth J.M.J. would be a wise investment because the corporation owned very valuable business assets and its operating losses were due merely to poor management. Because of its financial troubles he was able to acquire the corporation at a very favorable price. After the acquisition petitioner was able to significantly reduce Fifth J.M.J's operating expenses. Second, at the time the advances were made repayment was in fact contemplated by the parties and such expectation was reasonable. See Tollefsen v. Commissioner, 52 T.C. 671, 678 (1969), affd. 431 F.2d 511 (2nd Cir. 1970), cert. denied 401 U.S. 908 (1971). Respondent argues that because of Fifth J. *60 M.J's financial posture at the time the advances were made it should have been clear that they could not be promptly repaid. However, in Byerlite Corporation v. Williams, 286 F.2d 285, 290-291 (6th Cir. 1960), the court noted that the fact that the tangible assets of the corporation were not such, at any given time during the taxable period as to repay any part of the loan -- was not a controlling consideration requiring a conclusion that the advances were not loans * * *. As discussed, petitioner carefully examined the business records of Fifth J.M.J. prior to purchase of the stock. He noted that the corporation owned valuable business assets such as a marina on an excellent waterfront location, a favorable 99-year lease on its business premises and a first-class restaurant facility. Petitioner reasonably believed that with proper management Fifth J.M.J. could be turned into a profitable operation. The increased losses that Fifth J.M.J. subsequently suffered were attributable to unforeseeable adverse circumstances (sewage and kepone poisoning of the water, closing of the access road and the energy shortage). Thus, we believe that a good faith intention of *61 repayment existed at the time the advances were made which was consistent with the corporations' past practice. There was a reasonable expectation that the financial position of Fifth J.M.J. would improve [16] and that the funds would be promptly repaid. The subsequent adverse events which prevented repayment were unforeseeable at the time the transfers were made and hindsight cannot be employed here to reappraise the reasonableness of that expectation. Third, objective indicia of loans exists in that the nomenclature of debt was employed by the corporations. Byerlite Corporation v. Williams, supra at 290. The transfers were entered on the books of the transferor corporations as loans and on their balance sheets as assets. The transfers were listed on Fifth J.M.J's books as notes payable. [17] Although promissory notes were not *62 issued contemporaneously with the actual transfers of funds, Fifth J.M.J. did issue such notes on July 1, 1974, pursuant to corporate resolutions. The notes contain an unconditional promise to pay, provide for interest at 6 percent per annum and state a maturity date of July 1, 1979. Thus, after consideration of all the evidence, we find that the intercorporate advances to Fifth J.M.J. totalling $ 79,500 in 1972 and $ 83,300 in 1973 constituted bona fide loans and, accordingly, no part of these amounts constitute constructive dividends to petitioners. [18]
$ 100,000 TRANSFER FROM PACKING TO R & S On January 1, 1973, Packing, Cayce, Charlotte, Greensboro, Jacksonville, and Atlanta become wholly-owned subsidiaries of R & S. Within a 15-day interval in March 1973 *63 the sum of $ 100,000 was transferred from Packing to R & S, from R & S to Atlanta, and from Atlanta to petitioner. Petitioner subsequently used the $ 100,000 to meet operating expenses and to service fixed debt obligations of Fifth J.M.J. In the notice of deficiency respondent determined that the March 9, 1973, transfer of $ 100,000 from Packing to its parent, R & S, is taxable to petitioner as a constructive dividend. On brief, respondent argues that the series of transfers are inextricably related and must be considered as a whole. According to respondent, the taxpayer received a constructive dividend because the transfers were merely an indirect method of providing funds to Fifth J.M.J. in order to satisfy petitioner's contractual commitment to invest $ 150,000 in the corporation. As we have discussed, transfers of funds between related corporations can result in constructive dividends if the transfers were made primarily for the benefit of a common shareholder, Gilbert v. Commissioner, supra; Magnon v. Commissioner, 73 T.C. 980, 994 (1980). We have found, however, that by the end of 1972 the contractual commitment to invest $ 150,000 *64 in Fifth J.M.J. had been satisfied to the extent of $ 143,479.92 and, accordingly, petitioner's obligation to invest 90 percent of the remaining amount was reduced to $ 5,858.07.We are unpersuaded that petitioner's obligation to invest this relatively nominal sum can serve as the basis for concluding that the $ 100,000 transfer constitutes a constructive dividend to him. In addition, the parties stipulated that one link in the chain of transfers (the transfer of the $ 100,000 from Atlanta to petitioner on March 23) constituted a partial repayment of certain advances petitioner had previously made to Atlanta. The parties also stipulated that after the repayment, the balance still owing petitioner from Atlanta was $ 56,212.85. [19] Thus, although the funds were actually diverted to petitioner, he received them not in his capacity as a shareholder but rather as a creditor of the corporation. [20]Section 301 and respondent's corresponding regulation provide that dividend treatment "is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder in his capacity as such." Section 1.301-1(c), Income Tax Regs. *65 It appears to us that upon petitioner's receipt of the funds from Atlanta (stipulated to be the repayment of advances), the chain was broken.Accordingly, the subsequent use to which the funds were put is irrelevant to a determination of the existence of a constructive dividend. Because petitioner received the $ 100,000 from Atlanta as a creditor of the corporation the payment was not received in his capacity as a shareholder. [21] Accordingly, the amount is not taxable to petitioner as a dividend. *66 Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Because Mae M. Swain is a petitioner herein solely by virtue of having filed a joint return with her husband, hereafter Elbert D. Swain will be referred to individually as the petitioner.↩
3. Prior to January 1, 1973, petitioner owned and operated as sole proprietorships a restaurant in Raleigh, North Carolina, and one in Jacksonville, Florida. On January 1, 1973, petitioner sold all the assets of the Raleigh restauarnt (which included $ 25,384.86 in cash) to Packing for $ 100,000. Mr. Swain received no direct payment for the assets during 1973 and the entire purchase price was recorded as payable to him on Packing's books. Also on January 1, 1973, petitioner sold to Jacksonville all of the assets of the Jacksonville restaurant (which included $ 29,568.54 in cash) for $ 100,500. Again, the entire purchase price was recorded as payable to petitioner on Jacksonville's books and no direct payments were made to him during 1973. Petitioner reported the entire taxable gain incident to the above sales on his 1973 joint income tax return.↩
4. Judith S. Keener, Annie M. Swain and Linda C. Swain are daughters of the petitioner. Eugene R. Keener is petitioner's son-in-law.↩
5. Upon the assignment of 12 shares of stock, Castleberry agreed to be responsible for investing one-tenth ($ 15,000) of this amount. Castleberry has served as president of Fifth J.M.J. from August 1, 1970, to the date of trial.↩
*. Check to former owners for settlement of Quality Court franchise was paid in June of 1973 but not recorded until 6/30/74. The figure is stipulated as $ 775,819.06 but the correct total of the numbers in the column is $ 775,779.06.
**↩ Payment of mortgage was not recorded until June 30, 1974.
6. At the time Packing advanced this amount to R & S, Packing was indebted to petitioner in the amount of $ 28,215.76. ↩
7. Atlanta had owed petitioner $ 156,212.85 prior to the $ 100,000 partial repayment.↩
8. A positive figure represents a net payable by R & S and a negative figure a net receivable by R & S.↩
9. At all relevant times petitioner was a net creditor of the corporations.↩
10. Castleberry retained the 12 remaining shares of Fifth J.M.J.↩
*. The figure is stipulated as $ 692,818.34 but the correct total of the numbers in the column is $ 694,135.81.↩
11. Respondent subsequently conceded that because Cayce's 1972 income was only $ 31,831.78, the alleged constructive dividends from Cayce totalling $ 48,000 was in error. At trial and on brief respondent conceded that the dividend alleged in the notice of deficiency was excessive in the amount of $ 16,168.82. Thus, the amount of the alleged constructive dividend remaining in dispute for 1972 is $ 63,331.78. ↩
12. These amounts of additional taxable income for 1972 and 1973 alleged by respondent reflect the annual $ 100 dividend exclusion of section 116.↩
13. For example, petitioner testified that after his first restaurant, Raleigh, had been operating successfully for approximately 2 years, it lent funds to open the Charlotte restaurant. Charlotte subsequently lent money to Cayce and Cayce, in turn, lent money to Greensboro. All these loans were repaid. ↩
14. Each of the corporations had a significant business interest in the inclusion and continued success of other restaurants in the chain. The restaurantes operated under a single name, issued a common credit card and advertised the location of the other restaurants. R & S was in the business of providing supplies and managerial services for the corporations, including Fifth J.M.J., and thus its own profitable operation was directly dependent upon the successful operation of the corporations in the chain and the addition of new member restaurants.↩
15. We do not consider the fact that Fifth J.M.J. was an ongoing operation and included a motel as well as a restaurant renders the factual situation "vastly different", as respondent argues.↩
16. In fact, the loss for the year ending June 30, 1970, one month before petitioner purchased the stock, was only $ 1,045.21. This compares with a loss of $ 55,004.31 incurred the previous year. Thus, with petitioner's plans to cut operating expenses it was reasonable to believe that the corporation would become profitable.↩
17. Respondent points out that the June 30, 1973, year-end balance sheet of Fifth J.M.J. listed the advances as loans from shareholders. Given the otherwise consistent treatment of these transfers, we do not find such bookkeeping entry significant. ↩
18. As we are able to resolve this issue on the basis of the characterization of the advances as bona fide loans, we do not address petitioner's alternative arguments.↩
19. Respondent has not attempted to qualify these stipulations by arguing that the advances to Atlanta by petitioner were not bona fide loans and indeed such an argument would belie the language of the stipulations. ↩
20. Although the transfer of corporate funds from a fiscally sound corporation to an insolvent or near insolvent related corporation for the purpose of enabling the transferee to repay a debt to the controlling shareholder could constitute a constructive dividend to such shareholer, we do not find that situation extent here. See Sammons v. Commissioner, 472 F.2d 449, 454↩ (5th Cir. 1972), affg. in part and revg. in part and remanding a Memorandum Opinion of this Court. We have found that Atlanta had a positive book net worth at all relevant times, was able to meet its operating expenses, and that the fair market value of real estate owned by Atlanta was substantially greater than its book value. 21. As the court noted in Sammons v. Commissioner, supra at 454, because full consideration had passed to the corporation when the debts were created, the repayment of the corporate debts could not constitute a distribution to [petitioner] for he received nothing that was not already owed. See also Siff v. Commissioner, T.C. Memo. 1980-566↩.